**Danny Lee STRONG, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 1353–87.**

Court of Criminal Appeals of Texas, En Banc.

May 24, 1989.

Rehearing Denied June 21, 1989.

**544**

Richard Alley, Fort Worth, for appellant.

Tim Curry, Dist. Atty. and C. Chris Marshall and Betty Stanton, Asst. Dist. Attys., Fort Worth, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

DUNCAN, Judge.

The appellant, Danny Lee Strong, was convicted of murder pursuant to V.T.C.A. Penal Code, § 19.02(a). After Strong pled true to three enhancement paragraphs, the jury assessed his punishment at 99 years in the Texas Department of Corrections. In his direct appeal, the appellant complained that the trial court had erred when it admitted into evidence a letter he had written to a then co-defendant's attorney. The court of appeals rejected his complaint and affirmed his conviction. *Strong v. State*, 739 S.W.2d 506 (Tex.App.—Ft. Worth, 1987). We affirm.

This is a case of first impression. We granted appellant's petition for discretionary review to address the issue of attorney-client privilege under Rule 503 of the Texas Rules of Criminal Evidence.[1]

### I.

Both the appellant and his accomplice, Deana Sweeney, were charged with the

1. Rule 503 is as follows:

Rule 503. Lawyer–Client Privilege

(a) Definitions. As used in this rule:

(1) A "client" is a person, public officer, or corporation, association, or other organization or entity, either public or private, who is rendered professional legal services by a lawyer, or who consults a lawyer with a view to obtaining professional legal services from him.

(2) A representative of a client is one having the authority to obtain professional legal services, or to act on advice rendered pursuant thereto, on behalf of the client.

(3) A "lawyer" is a person authorized, or reasonably believed by the client to be authorized, to engage in the practice of law in any state or nation.

(4) A "representative of the lawyer" is: (i) one employed by the lawyer to assist the lawyer in the rendition of professional legal services; (ii) an accountant who is reasonably necessary for the lawyer's rendition of professional legal services.

(5) A communication is "confidential" if not intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication.

(b) General rule of privilege. A client has the privilege to disclose, and to prevent others from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client and made: (1) between him or his representative and his lawyer or his lawyer's representative, (2) between his lawyer and the lawyer's representative, (3) by him or his representative or his lawyer or the representative of the lawyer to a lawyer, or a representative of a lawyer representing another party in a pending action and concerning a matter of common interest therein, (4) between representatives of the client or between the client and a representative of the client, or (5) among lawyers and their represent-atives representing the same client. A client has the privilege to prevent the lawyer or the lawyer's representative from disclosing any other fact which came to the knowledge of the lawyer or the lawyer's representative by reason of the attorney-client relationship.

(c) Who may claim the privilege. The privilege may be claimed by the client, his guardian or conservator, the personal representative of a deceased client, or the successor, trustee, or similar representative of a corporation, association, or other organization, whether or not in existence. The person who was the lawyer or the lawyer's representative at the time of the communication is presumed to have authority to claim the privilege but only on behalf of the client.

(d) Exceptions. There is no privilege under this rule:

(1) Furtherance of crime or fraud. If the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud;

(2) Claimants through the same deceased client. As to a communication relevant to an issue between parties who claim through the same deceased client, regardless of whether the claims are by testate or intestate succession or by inter vivos transaction;

(3) Breach of duty by a lawyer or client. As to a communication relevant to an issue of breach of duty by the lawyer to his client or by the client to his lawyer;

(4) Document attested by a lawyer. As to a communication relevant to an issue concerning an attested document to which a lawyer is an attesting witness;

(5) Joint clients. As to a communication relevant to a matter of common interest between or among two or more clients if the communication was made by any of them to a lawyer retained or consulted in common, when offered in an action between or among any of the clients.

murder of Robert E. Thomas. At trial, Sweeney related the facts of the offense as follows: Appellant began living with Sweeney (who was estranged from her husband, Frank) in the summer of 1985. On December 6, 1985, after traveling from Lubbock, appellant and Sweeney ended up in a Fort Worth truck stop coffee shop after an evening of bar hopping. There they met Thomas, a local resident who frequented the coffee shop, and engaged him in conversation. Eventually Sweeney asked Thomas if they could stay the night at his place. Thomas agreed, and the trio rode in Thomas' car to his nearby garage apartment. The one room efficiency had only a single bed. The three talked and drank long into the night, at one point discussing the possibility of appellant's employment with Thomas, who was an electrician by trade. Around 2:30 a.m., after the beer ran out, appellant prepared to sleep on the floor near Thomas' bed while Sweeney settled on some cushions in a nearby corner. After appellant had presumably drifted off to sleep, Thomas accosted Sweeney, insinuating that he "wasn't going to sleep by hisself [sic]." Sweeney answered "don't start nothing, man, just go to bed." With that, the appellant abruptly rose from the floor where he had been feigning sleep. Momentarily concealing his jealous temper, he calmly told Thomas that he needed to use the bathroom. Thomas replied that he had no toilet paper, and reached into a closet to get some newspapers for his house guest. Appellant suddenly jumped

Thomas, wrestling him to the floor. Taking control, he ordered Thomas to empty his pockets. When Sweeney asked what he was doing, appellant replied "just sit there and shut the fuck up!" While Thomas was dazed and lying on the floor, appellant kicked him violently in the head, ordering him not to move or he would "kick his brains out." He taped Thomas' mouth shut with duct tape to silence him, and hurriedly tied him about the neck, hands and feet with an orange extension cord. The appellant then drew the extension cord "real tight," until Thomas was bound in a fetal position. Announcing "this is what you deserve," appellant stood up and urinated on Thomas' head and shoulders. According to the medical examiner's testimony, Thomas died of asphyxiation due to strangulation some fifteen minutes later. Appellant and Sweeney then fled in Thomas' car, all the while appellant warning Sweeney "you know what I do to snitches, don't you?"

Over a month later, on February 4, 1986, Sweeney voluntarily surrendered to the authorities in Jackson, Mississippi. Three days after that, the appellant was arrested. Both were extradited to Texas and incarcerated in the Tarrant County Jail. On February 9, 1986, Sweeney voluntarily made a statement to the authorities which related essentially the same facts to which she testified at trial.[2]

After their arrest, each were provided two court-appointed attorneys. Mr. Link and Mr. Lewis were appointed to represent

2. While both were in jail, prior to Sweeney giving a statement to the authorities, she wrote to appellant. Her letter, introduced by the defense at trial, contradicted both Sweeney's testimony and her written statement. She later admitted on the witness stand that she wrote the letter at appellant's behest, and that the information it contained was fabricated. In part, the letter is as follows:

Dear Danny, How's it going, baby boy? Not worth a shit, huh? A detective called me down today and he said that he had been running your mouth about me and I am here to tell you it pissed me off big time because I knew better than that. Who in the hell does he think he is? I told him right to his face I know how they worked trying to use two against the middle. He also said you told him you didn't know if you done it. Ain't that a

bitch? I said I know he didn't sign no statement saying he done something he didn't do. He said you was only looking out for yourself and that I need to start doing the same ... Goddamn, I wish they'd leave me alone. They try so hard to catch me in a lie, but how are they going to catch us in a lie when we ain't done nothing. All I know, baby boy, is that I love you more than life itself and nothing will ever change that. Keep your chin up, because everything will work out in time, it's just got to because we love each other too much to be apart ... Love Always, Deana. At trial, Sweeney explained why she wrote the letter:
[Sweeney]: The statement I gave the police is true ... Danny said that they copied the letters, they read letters in the mail, you know? So that's why I wrote it like that.

the appellant, while Sweeney was initially represented by Mr. Haley and Mr. Baldwin.

In his petition for discretionary review, the appellant contends that the trial court erred in admitting into evidence the following letter he wrote to Baldwin, Sweeney's attorney:

April 10, 1986

Mr. Charles F. Baldwin

You and Mr. Haley have been appointed by a Judge of one of the Criminal District courts to represent, Mrs. Sweeney, on a Capital Murder Charge, and Danny Strong. (This is and will be, one-case!) "Not separate," sir.

Mr. Baldwin, I would never attempt to advise you, are any other lawyers, on this case. (Not until I see that one of you are not acting in mine and Mrs. Sweenys, best interest!) All of you were appointed by the courts, and you're jobs are to defend and establish the innocence, of the innocent.

Mr. Baldwin, everytime you take yourself to jail, to pressure Mrs. Sweeney. To, *"turn-state's-evidence"* against me. Is not using your, best ability, or judgment, as a professional-criminal attorney, concerning her or, our case! "So far," all you have accomplished. Is getting Mrs. Sweeney so up-set, to the point of a nervous break-down!

Mrs. Sweeney has told you repeatedly ... "That *no*, she will not do as you (wrongly) ask!" If you keep persisting in, pressuring, badgering and up-setting (Supposedly) your client and not showing any interest in this case. (Just to, "cop-out," or, "let's make a deal" type case). You, (are any of the other lawyers that feel this way" will be asked to with-draw from this serious and unjust charge & case!

This case is "one," not separate! We are testifying for each other, of our innocence.

Robert E. Thomas (deceased) was in the process of committing a, "terrible and felonious-crime," of forcible-rape, against Mrs. Sweeney!" "In which," I stepped-in to stop, said crime, from happening. To the point of almost losing my life, by being attacked from, behind, by Robert E. Thomas with a sledge-hammer. (If you would like to talk with Mrs. Sweeney & I, "concerning this alleged-crime," please do so.)

Since, Mr. Haley, Mr. Lewis Mr. Link and yourself, are representing us. We (Mrs. Sweeney and myself) are informing all four (4), "that you have our permission," to discuss and research our-case together and as a team!

Sincerely, /s/

1–7F1.–Tank E (Danny Lee Strong)
300 W. Belknap
Ft. Worth, Tx.
76102–2083

P.S.—Mrs. Sweeney's only crime, "was being an attractive-lady in the presents of a, drunken, dirty-horny, Robert E. Thomas!" Mrs. Sweeney, *had nothing to do* with anything else. "Except," leave with me in Robert E. Thomas's car, in panic & fear! [*sic et passim*]

Baldwin, the recipient of the letter, as previously noted, at that time represented Sweeney while she was in custody on charges of capital murder. After she was indicted for murder and made bond on June 12, 1986, she retained Jim Shaw as her attorney. Baldwin thereafter gave Shaw Sweeney's file, including the letter authored by appellant. Shortly thereafter, Shaw turned the letter over to the State, assuming "by [Sweeney's] actions or failure to react that it was okay."

Meanwhile, Sweeney continued to visit the appellant in jail. She testified that on one such occasion, he attempted to persuade her to testify that Thomas came after him with a sledge hammer, and that the murder was committed in defense of himself and Sweeney. This self-defense claim was apparently not asserted at trial. Eventually, Shaw persuaded Sweeney to testify against the appellant in exchange for a plea to robbery, resulting in a sentence of two years.

At trial, the letter was introduced over the appellant's strenuous objection "under the basis of the attorney-client privilege between Mr. Baldwin and Ms. Sweeney at

the time of this alleged letter he was supposed to have received." Link, counsel for the appellant, further objected during the reading of the letter that "It's clear that Mr. Strong was under the impression that Mr. Baldwin was assisting in his representation as well." The appellant perfected his objection by a bill of exception while the jury was deliberating on the guilt issue.

██ It should be noted at the outset that Sweeney was an accomplice witness— someone who has participated with another before, during or after the commission of a crime. *Villarreal v. State*, 576 S.W.2d 51 (Tex.Cr.App.1978), *cert. denied*, 444 U.S. 885, 100 S.Ct. 176, 62 L.Ed.2d 114; Article 38.14, V.A.C.C.P. As such, her testimony is untrustworthy and should be received and viewed with caution. *Eckert v. State*, 623 S.W.2d 359 (Tex.Cr.App.1981), *Walker v. State*, 615 S.W.2d 728 (Tex.Cr.App.1981). Specificity, however, is not required; the corroborating evidence need only tend to connect the defendant with the offense committed. *Reed v. State*, 744 S.W.2d 112 (Tex.Cr.App.1988).

In the instant case, there were no other witnesses besides Sweeney to the offense. No identifiable fingerprints were obtained from the home or vehicle of the deceased. In short, there was no conclusive evidence presented at trial to directly link the appellant to the offense. The letter written by appellant corroborated the accomplice-witness testimony of Sweeney, who left the murder scene, according to the letter, "with [the appellant] in Robert E. Thomas's car, in panic and fear!" Plainly, the introduction of the letter was critical to prosecution. Without it, the State would have failed to corroborate the testimony of Sweeney, their key witness upon whose version of the facts the State's case was predicated. The letter's significance having been addressed, we turn to whether the letter should have been barred from admission under the attorney-client privilege.

## II.

### *The Attorney–Client Privilege*

██ "Reserved communication," wrote one commentator, "is the means of psychic self-preservation for men in the metropolis." [3] For over four hundred years, the attorney-client privilege has operated, at least in theory, to promote such "reserved communication." Professor Ray noted that "in the early days ... the chief consideration was the oath and honor of the attorney. Such a basis could not long endure...." R. Ray, 1 Texas Practice, § 421 at 400 (3rd ed. 1980). In current legal practice, the oldest of privileges known from the common law has taken on a more pragmatic justification: the need for lawyers "to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out." *Fisher v. United States*, 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1980); *Upjohn Co. v. United States*, 449 U.S. 383, 387, 101 S.Ct. 677, 681, 66 L.Ed.2d 584 (1981). While sometimes cloaked in basic notions of privacy, the aspirational purpose of the privilege is the promotion of communication between attorney and client unrestrained by fear that these confidences may later be revealed. *Cruz v. State*, 586 S.W.2d 861, 865 (Tex.Cr.App.1979); *West v. Solito*, 563 S.W.2d 240, 245 (Tex.1978). Critics maintain that the privilege "impedes [the] full and free discovery of the truth" [4] and is "in derogation of the public's 'right to every man's evidence.'" [5] Notwithstanding the tenor of current debate on the subject, it is important to bear in mind that the lawyer-client privilege is not a principle of constitutional proportions, but an exclusionary rule of evidence. *OKC Corp. v. Williams*, 461 F.Supp. 540, 546 (N.D.Tex.

---

3. Krattenmaker, T., "Testimonial Privileges under the Federal Rules of Evidence: A Suggested Approach" 64 *Geo. L.J.* 643, 649 (1976) quoting Westin, A., *Privacy and Freedom*, at 38 (1970).

4. *Weil v. Investment/Indicators, Research and Management*, 647 F.2d 18, 24 (CA9 1981).

5. *In re Horowitz*, 482 F.2d 72, 81 (CA2 1983), *cert. denied* 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86.

1978).[6] Accordingly, the privilege has been limited both by statutory exception and strict construction.

The Advisory Committee for the Federal Rules of Evidence proposed thirteen controversial rules of privilege, all of which met with such resistance to their adoption that only a single, general rule emerged: "[T]he privilege ... shall be governed by the principles of common law as they may be interpreted by the courts of the United States in light of reason and experience." Fed.R.Evid. 501.

In the Texas Rules of Criminal Evidence, the attorney-client privilege is embodied in Rule 503.[7] Rule 503 is an almost verbatim recitation of the proposed but unenacted Rule 503 of the Federal Rules of Evidence.[8] Although the Texas rule has broad applicability, it is limited by other statutory provisions. For example, while the Texas privilege rules explicitly apply at all stages of criminal actions, cases, and proceedings according to Rule 1101(b), the statutory privileges are limited by Rule 501, which states that the "privileges are recognized only as provided."

Relevant to our inquiry is Rule 503(b)(3), supra, which applies to situations where two or more clients sharing some common interest retain separate counsel and then pool information or design a joint defense. Subsection (b)(3) of Rule 503 serves as the primary focus of appellant's petition for discretionary review.

In his petition for discretionary review, the appellant contends: (1) that he "reasonably believed" that attorney Baldwin was acting on behalf of Sweeney and himself, and (2) at the time the above-quoted letter was written, he and Sweeney had undertaken a "joint defense" to the murder prosecution. Quoting from appellant's brief, he argues that Rule 503(a)(3) and 503(b)(3), read together "means if a person has a common interest with an attorney for another and he reasonably believes said attorney also represents him because of the common interest, the privilege applied [sic]." We will first address whether Baldwin was appellant's lawyer, based on the appellant's "reasonable belief" as the term is used in Rule 503(a)(3).

### III.

#### *The Lawyer–Client Relationship Under Rule 503(a)(3)*

Relative to appellant's claim that Baldwin was representing him as well as Swee-

---

**6.** But see generally, Dashjian, M., "The Attorney–Client Privilege and the Criminal Defendant's Constitutional Rights," 70 *Calif.L.Rev.* 1048, for the proposition that in criminal cases the attorney-client privilege is essential to both the Fifth Amendment privilege against self-incrimination and the Sixth Amendment right to counsel.

**7.** The Texas Rules of Criminal Evidence, Rule 501 *et. seq.* were adopted December 18, 1985, and made effective September 1, 1986. Prior to enactment, the attorney-client privilege was codified under Article 38.10, V.A.C.C.P. (Vernon, 1979) (repealed):

[A]n attorney at law shall not disclose a communication made to him by his client during the existence of that relationship, nor disclose any other fact which came to the knowledge of such attorney by reason of such relationship.
*Id.*
Article 38.10 may be traced to art. 646 of the 1856 Code of Criminal Procedure. The above rule and its statutory predecessors apparently applied equally to civil cases. *Miller v. Pierce,* 361 S.W.2d 623, 625 (Tex.Civ.App.—Eastland,

1962, no writ); *Cochran v. Cochran,* 333 S.W.2d 635, 641 (Tex.Civ.App.—Houston [1st Dist.] 1960, writ ref'd n.r.e.); *Williams v. Williams,* 108 S.W.2d 297, 299 (Tex.Civ.App.—Amarillo, 1937, no writ); *Baker v. Beto,* 349 F.Supp. 1263, 1269 (S.D.Tex.1972). See S. Goode and M. Sharlot, "Article V: Privileges" Texas Rules of Evidence Handbook, 20 *Hous.L.Rev.* 273, 280–286 (1983).

**8.** There are two areas where the Texas rule differs from the proposed Federal rule: First, unlike the proposed Federal rule, which required that the communication relate to a matter of common interest, Texas Rule 503(b)(3), requires in addition that the communication concern a pending action with the other party. Second, the Texas rule differs from the proposed Federal rule by the appendage of a single sentence at the end of 503(b): "A client has a privilege to prevent a lawyer or the lawyer's representative from disclosing any other fact which came to the knowledge of the lawyer or the lawyer's representative by reason of the attorney-client relationship." The drafters of the Texas rule added the sentence in an effort to incorporate former Article 38.10, V.A.C.C.P., into Rule 503.

ney, Rule 503(a)(3) defines a "lawyer" as "a person authorized, *or reasonably believed by the client* to be authorized, to engage in the practice of law in any state or nation." [Emphasis added] *Id.* The appellant argues that a subjective, reasonable belief on the part of a person that a lawyer is acting in his behalf is sufficient to establish an attorney-client relationship meriting the protection of the statutory privilege.

Appellant testified out of the jury's presence that he was under the impression that all four defense lawyers were representing the common interests of himself and Sweeney. Countering appellant's testimony was that of Baldwin, who stated that he had never seen or conversed with the appellant because he "considered it a conflict between Ms. Sweeney and Mr. Strong." From the record it appears that the only communication between the appellant and Baldwin was the aforementioned letter, to which Baldwin did not respond. Baldwin did admit, however, that he had "casual conversations with his [appellant's] attorney," Lewis, concerning this case.

■ The appellant's reliance on his "reasonable belief" that Baldwin was his attorney is, in this context, misplaced. The subjective standard in Rule 503(a)(3) relates to whether the client reasonably believes that the individual he or she is consulting is a licensed attorney. By its terms, Rule 503(a)(3) requires more than a mere belief that the individual consulted is a licensed attorney; that belief must be "reasonable." A client's mere belief that he is consulting an attorney will not invoke the privilege. Ray, supra, § 423, at 406. We do not doubt that the appellant believed Baldwin to be a licensed attorney. However, in light of the record showing the appointment of two attorneys to represent each defendant on February 14, 1986, coupled with evidence that Baldwin never communicated with the appellant at any stage of his prosecution, it is clear that Baldwin was never the appellant's attorney. Accordingly, the trial court was correct in finding that he was not.

The question remains whether the letter should have been shielded from the jury under the attorney-client privilege under Rule 503(b)(3), *supra.* It is clear that certain communications are privileged if they concern a matter of "common interest" between a defendant and a co-defendant or the attorney for a co-defendant in a pending action.

### IV.

### *"Common Interest" Under Rule 503(a)(3)*

Rule 503(b) states the general rule of the lawyer-client privilege in Texas:

(b) General rule of privilege. A client has a privilege to refuse to disclose and to prevent others from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client and made:

Rule 503(b) is somewhat expanded when the confidential communication is made

(3) by him or his representative or his lawyer or the representative of a lawyer to a lawyer, or a representative of a lawyer *representing another party in a pending action and concerning a matter of common interest therein* [emphasis added].

The Advisory Committee's note to proposed Rule 503(b)(3) of the Federal Rules (which is, as earlier stated, nearly identical to the Texas rule) ambiguously suggests that the positions of the parties need not be compatible in all respects for a privilege based on a "common interest" to apply:

The third type of communication occurs in the "joint defense" or "pooled information" situation, where different lawyers represent clients who have *some* interests in common ... The rule does not apply to situations where there is *no* common interest to be promoted by a joint consultation, *and* the parties meet on a purely adversary basis. [Emphasis added]

Committee on Rules of Practice and Procedure of the Judicial Conference of the Unit-

ed States, Rule 503(b)(3), 51 F.R.D. 315, 361–362 (1971).

The Committee Note fails to differentiate between a "joint defense" and "pooled information" situation. It does not distinguish whether communications between parties who are *not* meeting "on a purely adversary basis" fall within the ambit of the privilege. One commentator noted that the use of the conjunctive "and" in the last sentence implies that there can be a common interest wherever the parties are not purely adversaries. "The Attorney–Client Privilege in Multiple Party Situations," 8 *Colum. J.L. & Soc. Probs.*, 179, 192–193 (1972). The question, then, is what constitutes an adversary relationship sufficient to deny a privilege to communicating parties under Rule 503(b)(3)? In our view, the privilege protects sharing information for any defensive purpose common to the participating defendants.

In the case before us, the court of appeals held Rule 503(b)(3) inapplicable because they found no "common interest" or "joint defense" between Sweeney and appellant. The court concluded that Sweeney's position was adversarial to appellant's thus no attorney-client privilege attached. *Strong v. State*, 739 S.W.2d 506 (Tex.App.—Ft. Worth, 1987). In reaching its decision, the court of appeals relied on *Vance v. State*, 190 Tenn. 521, 230 S.W.2d 987 (1950), *cert. denied* 339 U.S. 988, 70 S.Ct. 1010, 94 L.Ed. 1389, a decision issuing from the Supreme Court of Tennessee. Similar to this case, the State's case in *Vance* rested largely on the testimony of an accomplice witness (King) who was jointly indicted with the defendant. King obtained a severance and later pleaded guilty, confessing to the offense. At Vance's trial the State called King's lawyer, who testified that at a joint conference the defendant admitted that King's confession was true, thereby implicating himself.

King's lawyer stated that the conference was held at the request of the defense counsel, and that he had never acted as Vance's lawyer. Accordingly, the Tennessee court held that King and his attorney were not, at the time of the conference, engaged in planning a "joint defense" in which all parties had an interest; thus, the communication was not privileged. *Id.*, 230 S.W.2d at 990. While we find *Vance* persuasive, it is not dispositive on the issue before us. On the facts, while the relationship between King and Vance was not one of mutual cooperation, it is an overstatement to conclude that they were pure "adversaries." See *Colum. J.L. & Soc. Probs.*, supra, note 97 at 192. In *Vance*, it appears that the prevailing consideration for denying the privilege was that the public interest in revealing the defendant's admission of guilt outweighed the advantages of the privilege. *Id.* Moreover, *Vance* was decided under the common law of Tennessee relating to the attorney-client privilege. While the common law offers some guidance on the issue of attorney-client privilege, the current Texas rules recognize the privilege only within the confines of specific parameters. Rule 501, supra.

Neither the authorities cited by counsel nor the authorities uncovered by our own research reveal a case addressing the same issue as the one before us. The rules do not provide a definition of the term "common interest," and the relevant criminal case law both within and outside this jurisdiction is unexpectedly sparse.[9] We choose to rely upon those few cases and their predecessors which have attempted to determine what would constitute a "common interest" under proposed Federal Rule 503(b)(3).

Courts in several cases have found a confidential relationship to exist despite the fact that the communication in question was made to counsel for the co-defen-

---

**9.** A survey of jurisdictions reveals that several States have adopted a lawyer-client privilege provision similar to Texas Rule 503(b)(3). See, e.g., *Okla.Stat.Ann.* (Evidence Code) tit. 12 Ch. 40 Art. 5, § 2502(A)(5)(3) (West, 1978); *Ark. Code Ann.* (Uniform Rules of Evidence) tit. 16 Ch. 41 Art. 5, Rule 502(b)(3) (1987); *Wis.Stat.* (Evidence) Ch. 905 § 905.03(2)(c) (1985–86); *Neb.Rev.Stat.* (Rules of Evidence) Ch. 27 Art. 5 § 27–503(2)(c) (1975). However, the few cases which arguably fall within the "common interest" provisions of other State statutes offered no guidance relative to our issue.

dant(s). In *United States v. McPartlin,* 595 F.2d 1321 (CA7 1979), *cert. denied* 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43, the defendant was entitled to the protection of the attorney-client privilege because his statements, which tended to exculpate his co-defendant, were made in confidence to an investigator for the co-defendant's attorney. While the defendants were not jointly represented by counsel, the statements in *McPartlin* were made in connection with a plan to discredit a witness, a project in which the two defendants and their attorneys were engaged for the benefit of both defendants. The court concluded that McPartlin's statements were "entitled to the attorney-client privilege, because his [the defendant's] statements were made in confidence to an attorney for a co-defendant for a *common purpose* related to both defenses [emphasis added]." *Id.*, at 1336. The rationale of the common-purpose theory is that when two co-defendants decide to join in a common effort, "the attorney for each represented both for purposes of that joint effort." *Id.*, at 1337.

Similarly, in *Hunydee v. United States,* 355 F.2d 183 (CA9 1965), the Ninth Circuit held that statements made by Hunydee during a joint conference held for the purpose of discussing his willingness to plead guilty, a matter of common interest, which affected both attorneys' subsequent representation of their respective clients, were privileged. Cf. *Grand Jury Subpoena Duces Tecum Dated November 16, 1974,* 406 F.Supp. 381 (S.D.N.Y.1975) (privilege covers communications to a prospective or actual co-defendant's attorney when these communications are engendered solely in the interests of a joint defense effort); *Chahoon v. Commonwealth,* 62 Va. (21 Gratt.) 822 (1871) (memoranda prepared by several attorneys relating to defendants' joint indictment for conspiracy held privileged); *Schmitt v. Emery,* 2 N.W.2d 413 (1942) (common interest of the co-defendants related to the exclusion of a specific item of evidence); *Continental Oil v. United States,* 330 F.2d 347 (CA9 1964)

(memoranda prepared by attorneys in joint consultation relating to clients' appearance before grand jury privileged).

Contrary to *McPartlin*, supra, the privilege was denied in *Government of Virgin Islands v. Joseph,* 685 F.2d 857 (CA3 1982). In that case, charges of assault, robbery and rape were brought against Joseph and Motta. Prior to the indictment, Motta's attorney met with Joseph and obtained a confession signed by Joseph exculpating Motta. The written confession was inadvertently sent to the jury although it was not introduced into evidence at trial. Judge Higginbotham, writing for the Court, held that Joseph could not rely on the common purpose theory because "Motta's interests were at all times completely antagonistic to the interests of Joseph ... At no time does it appear that Joseph believed he was participating in a joint defense effort [and] ... the purpose of Joseph's statements was to help his friend and co-defendant Motta." *Id.*, at 862. The court "declined to extend the attorney-client privilege where the defendant did not intend confidentiality and made his statements wholly divorced from the attorney-client relationship." *Id.*[10]

■ As in both *McPartlin* and *Joseph,* supra, we must first examine the purpose of the communication made by the appellant to attorney Baldwin: was it made in confidence for the purpose of facilitating the rendition of professional legal services? In *McPartlin*, the defendant's statements were uninhibited communications, made with his counsel's approval, and clearly intended to assist in a joint defense effort (to discredit a witness). Conversely, as in *Joseph*, appellant's communication with Baldwin was a unilateral act. While appellant's counsel and Baldwin had "casual conversations" regarding the case, there is no evidence in the record that a meeting or discussion was held for the purpose of planning a joint defense for Sweeney and appellant. Based on the record before us, we hold that the appellant failed to meet the

---

**10.** While the Third Circuit in *Joseph* held the attorney-client privilege inapplicable under the common interest theory, the court reversed because "plain error" resulted in the inadvertent admission of Joseph's confession. *Id.,* at 864.

burden of establishing that the purpose of the communication was to further the rendition of professional legal services to him.

■ Next, we must determine whether there was some common interest or defense between Sweeney and appellant that could have been advanced by the exclusion of the letter. A claim of "common interest" to support the lawyer-client privilege under 503(b)(3) cannot be supported by mere conclusory assertions. The burden of establishing the privilege is on the party asserting it. *United States v. Lopez*, 777 F.2d 543 (CA10 1985). The record reveals that Baldwin thought the appellant's motivation for writing the letter was to instruct him how to handle his defense of Sweeney, and to discourage his efforts in advising her to testify against the appellant. It is apparent that Sweeney had nothing to gain by asserting the privilege as to the letter. In fact, Baldwin acted properly in diligently pursuing Sweeney's best interests. The appellant alone benefited from attempting to have the letter excluded at trial, because the writing corroborated a significant facet of Sweeney's story. Sweeney's voluntary statement implicating appellant, made prior to appellant's letter, further underscores the absence of a common purpose in their respective defenses. Additionally, any commonality of defenses contemplated by appellant within the purview of Rule 503(b)(3) were unequivocally lost when Sweeney chose to face her former lover in open court and testify against him.

Unilaterally asserting a joint defense based on a common interest does not give rise to the lawyer-client privilege. Furthermore, the lawyer-client privilege must be tethered to a firm factual mooring before its protections may be invoked. Absent facts in the record showing any shared defenses between Sweeney and appellant, we hold the lawyer-client privilege inapplicable under the "common interest" provision in Rule 503(b)(3). Accordingly, the appellant's ground for review is overruled.[11]

The judgments of the trial court and court of appeals are affirmed.

TEAGUE, Justice, dissenting and concurring.

On direct appeal, notwithstanding the fact that neither a formal nor informal attorney-client relationship ever existed between Danny Lee Strong, henceforth appellant, and Hon. Charles F. Baldwin, who with Hon. Leon Haley was then representing Deana Sweeney; and notwithstanding the fact that Baldwin was never appointed to represent appellant, but was appointed with Haley solely to represent Sweeney, appellant having been appointed two other attorneys to represent him; notwithstanding the fact that no "joint defense" or "pooled information" scenario ever existed; notwithstanding the fact that Baldwin did not solicit the complained about letter from appellant; notwithstanding the fact that Baldwin never even visited appellant when appellant was incarcerated in the Tarrant County Jail; and notwithstanding the fact that there was no common interest in Bald-

---

**11.** While not raised by the appellant (but addressed in the State's brief), the issues of confidentiality and waiver are also relevant to the question of whether the communication was privileged. Under the rule, a communication is confidential if "it is not intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services ..." 503(a)(5), Tex. R.Cr.Evid. The record shows that appellant, while in custody awaiting trial, sent a letter to Sweeney's husband, Frank. The letter to Frank Sweeney, dated September 28, 1986, was sent after Sweeney agreed to testify for the State. Included in that correspondence was a copy of the letter at issue herein. Obviously, at that point the letter was not intended to be confidential, since appellant sent it to a third person

wholly removed from the proceedings. Further, the act of sending the letter to a third party clearly waived any privilege appellant intended to assert. See, e.g., *United States v. Melvin*, 650 F.2d 641 (CA5 1981) (no confidentiality when disclosures made to a person who has not joined the defense team, and with respect to whom there is not reasonable expectation of confidentiality); *In re Grand Jury Proceedings*, 727 F.2d 1352, 1357 (CA4 1984) ("It is the essence of the attorney-client privilege that it is limited to those communications which are intended to be confidential. 'The moment confidence ceases,' said Lord Eldon, 'privilege ceases.'"); citing with approval *United States v. Tellier*, 255 F.2d 441, 447 (CA2) *cert. denied* 358 U.S. 821, 79 S.Ct. 33, 3 L.Ed.2d 62 (1958).

win preparing a defense on behalf of Sweeney that might implicate appellant, appellant argued on appeal that the admission of the complained about letter into evidence was barred by the attorney-client privilege that he claimed existed between him and Baldwin. It is clear from this record that, except in appellant's imaginary belief, no kind of attorney-client relationship ever existed between Baldwin and appellant.

The Fort Worth Court of Appeals, in a well written and reasoned opinion by Justice Hill, correctly rejected the contention urged on behalf of appellant, that the trial judge erred in admitting into evidence an unsolicited letter which he, appellant, had written to Baldwin while he was incarcerated in the Tarrant County Jail. See *Strong v. State*, 739 S.W.2d 506 (Tex.App.–2nd 1987).

The record reflects that when appellant wrote Baldwin the unsolicited letter when he was incarcerated in the Tarrant County Jail, Baldwin and Haley had been appointed to represent Sweeney, who was then appellant's girlfriend and his co-defendant. Two other attorneys were appointed to represent appellant. Later, Sweeney retained Hon. Jim Shaw who thereafter represented her at all times. After Shaw commenced representing Sweeney, Baldwin gave the letter to Shaw who turned it over to a prosecuting attorney. In exchange for agreeing to testify against appellant, Sweeney was permitted to plead guilty to committing the offense of robbery. She was assessed a two year prison sentence.

The record is clear that Baldwin never acted, either unilaterally or in concert, as appellant's attorney when he represented Sweeney. The complained about letter that appellant sent Baldwin was unsolicited by either Baldwin or Haley.

I find that the court of appeals' holding comports with what a majority of this Court implicitly held in *Montelongo v. State*, 681 S.W.2d 47 (Tex.Cr.App.1984), that even where a licensed attorney of this State unilaterally, but lawfully, goes and visits with an incarcerated inmate, no kind of attorney-relationship is established as a result of that visit. Under *Montelongo*, if all that an attorney's lawful visit with an incarcerated inmate amounts to is the receipt of "unsolicited advice", clearly, under the circumstances of this case, the giving of "unsolicited advice" by an incarcerated inmate to his co-defendant's attorney does not create or establish any kind of attorney-client relationship. Cf. *Dunn v. State*, 696 S.W.2d 561 (Tex.Cr.App.1985).

Therefore, given the correctness of the court of appeals' holding, my vote is to put this Court's improvidently granted stamp to appellant's petition for discretionary review. I dissent to the failure of this Court to take such action. However, I concur in the majority opinion's holding that Baldwin and appellant never had any kind of attorney-client relationship, and that "Unilaterally asserting a joint defense based on a common interest does not give rise to the lawyer-client privilege."