Danny Lee MIXON, Appellant,

v.

The STATE of Texas.

No. PD–0018–06.

Court of Criminal Appeals of Texas.

May 23, 2007.

Allen C. Isbell, Houston, for Appellant.

Peyton Z. Peebles, III, Houston, Matthew Paul, State's Atty., Austin, for State.

## OPINION

HOLCOMB, J., delivered the opinion for a unanimous Court.

In this case, we are asked to determine whether, under Texas Rule of Evidence 503, an attorney-client privilege is established when a person consults with a lawyer with a view to obtaining professional legal services from him, even if the lawyer declines to represent that person at the end of the consultation. We hold that it does. A question remains, however, whether appellant in the present case might still not be entitled to the privilege because of the Rule 503(d) exception denying the privilege to a person seeking the services of a lawyer in furtherance of a crime. We therefore vacate the judgment of the court of appeals and remand the case to that court to address this question.

*Background*

On May 6, 2003, at about 10:30 p.m., appellant Danny Lee Mixon went to a trailer house, in Harris County, where Connie Gomez and Dwayne Ramdhanny lived. The couple was finishing a meal, and both of them opened the door when appellant knocked. Gomez saw appellant put on a glove, pull out a handgun, and point it at Ramdhanny. She jumped in front of Ramdhanny just as appellant fired, and the bullet went through Gomez's hand, hitting Ramdhanny in the face. Ramdhanny retreated into the adjacent bedroom, but appellant followed and shot him several times more as Ramdhanny lay on the floor. Appellant then turned to Gomez, who ran into a bathroom, closing the door behind her. Appellant fired his remaining bullets at the bathroom door, and then left the trailer house. Ramdhanny died as a result of his injuries, but Gomez survived.

The record shows the following facts pertinent to the issue before us. Appellant worked at a store called Northshire Video. Peter Heckler was the attorney of record for this store. According to Heckler's testimony, he was also generally responsible for the store, although he neither managed nor supervised the store directly. At about midnight, on May 6, 2003, Heckler received a telephone call from a store clerk who told him that the police had come looking for appellant at the store. Three hours later, appellant himself called Heckler, but Heckler refused to talk to him at that time because it was so late at night. The two men agreed to meet, and did meet, later that morning when they discussed the case at length.

Heckler's testimony at trial indicates that both he and appellant were in agreement that he would represent appellant until Heckler realized that his own gun might have been used in the offense, and he declined to represent appellant for that reason. Heckler also testified that appellant did not want the police to acquire either the handgun or the store videotape from the night of the murder. However, he failed to clarify in this testimony whether it was he or appellant who suggested actually getting rid of the gun and the videotape. The record shows only that, after his conversation with appellant, Heckler did pick up the gun from the store, but that it was two days later that he turned it over to the police. The videotape was never found.

During the guilt phase of the trial, both the State and the defense counsel asked the court specifically to determine whether the attorney-client privilege prohibited Heckler from testifying about appellant's discussion of the case with him. The trial court, therefore, held a hearing outside the presence of the jury, to address this question. Heckler was sworn in as a witness, and the trial court sought to determine exactly what he intended to testify to before the jury. The defense counsel objected on the ground that the divulging of any part of Heckler's conversation with appellant was a violation of the attorney-client privilege. The trial court stated that the defense counsel's "objection [was] well taken," but explained that it needed to know exactly what Heckler's testimony would be, in order to determine how much of that testimony the court would allow in front of the jury which would be making the actual "decisions in this case." After listening to Heckler's testimony and interrogating him at length, the trial court ruled that it would allow only that part of Heckler's testimony indicating that appellant had asked him to get rid of the gun. However, the record shows that Heckler's testimony on direct examination went beyond the court's ruling. The trial court had to intervene, send the jury out, and admonish

both the State and the witness to focus the testimony on the limited question of whether appellant had asked Heckler to get rid of the gun. In spite of the court's efforts to confine the witness's testimony to this critical point, Heckler failed to unequivocally state, either before or even outside the presence of the jury, that appellant had asked him to get rid of the gun. The trial court did not pursue the matter any further. The jury found appellant guilty of murder and sentenced him to life imprisonment.

On direct appeal, appellant raised two issues, only one of which is relevant to our review: that the trial court erred in allowing Heckler to testify that appellant did not want the weapon or the videotape to be turned over to the police, thereby violating the attorney-client privilege rule. The State made two main arguments in response. First, it asserted that the attorney-client privilege is not available to appellant because the evidence did not establish a contractual attorney-client relationship between him and Heckler. Second, it argued that even if an attorney-client relationship existed, Rule 503(d) barred the application of the attorney-client privilege to the present case, because appellant was trying to persuade Heckler to commit a "crime and fraud." The court of appeals did not address the State's second argument. Rather, focusing on the first argument alone and concluding that "Heckler's testimony [did] not support a finding that an attorney-client relationship existed," the court held that the trial court did not abuse its discretion in admitting the testimony. *Mixon v. State*, 179 S.W.3d 233, 236 (Tex.App.-Houston [14th Dist.] 2005).

We granted review to consider two issues: (1) whether the court of appeals erred in construing Rule 503 when it held that an attorney-client privilege does not exist unless the lawyer agrees to render professional services for a client; and (2) whether Rule 503 contemplates that an attorney-client privilege is established when a person consults with a lawyer with a view to obtaining professional legal services from him, even if the lawyer ultimately declines to represent that person.

### Discussion

■ Appellant argues that the court of appeals has interpreted Rule 503 too narrowly. He quotes the rule's explicit language, asserting that a "client" is a person who "consults a lawyer with a view to obtaining professional legal services from that lawyer," as well as a person who enters into an actual contractual relationship with a lawyer who agrees to render professional services for that person. Thus, appellant contends, when a person consults a lawyer with a view to employing him professionally, any information acquired by the lawyer in the interviews or looking toward such employment is privileged and cannot be disclosed, even though the person does not actually employ the lawyer. We agree.

Rule 503, Lawyer–Client Privilege, states in relevant part:

(a) Definitions.—As used in this rule:

(1) A "client" is a person ... who is rendered professional legal services by a lawyer, *or who consults a lawyer with a view to obtaining professional legal services* from that lawyer.

(b) Rules of Privilege.

(1) General Rule of Privilege.—A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client:

(A) between the client ... and the client's lawyer....

(2) Special rule of privilege in criminal cases.—In criminal cases, a client has a privilege to prevent the lawyer or lawyer's representative from disclosing *any other fact* which came to the knowledge of the lawyer or lawyer's representative by reason of the *attorney-client relationship.*

(Emphasis added.)

The use of the words "with a view to obtaining professional legal services" in the definition of "client," at the beginning of the rule, clearly indicates that the protection of the attorney-client privilege is available equally to those persons who had hired the lawyer as well as those still seeking to do so. Moreover, there is nothing in Rule 503(b)(2), the "Special rule of privilege in criminal cases" quoted above, to indicate a modification of that definition of "client."

■ The State argues that appellant should not be allowed to benefit from the attorney-client privilege because no attorney-client relationship was established between Heckler and appellant, and that such a relationship needs to be established before the attorney-client privilege is allowed. In making this argument, the State appears to be viewing the use of the phrase "attorney-client relationship" in Rule 503(b)(2) as a special requirement in criminal cases, restricting the availability of the privilege only to the cases where the lawyer had already agreed to represent the client. But there is nothing in the rule itself to support this interpretation. Moreover, if that phrase were in fact meant to be such a special requirement in criminal cases, it would have been defined in Rule 503(a), the section on definitions— at the very least to indicate when such relationship began and ended, so that the courts could determine the period in which the privilege applied. In addition, it is important to note that the phrase "attorney-client relationship" does not appear anywhere in the rule except in 503(b)(2), the "Special rule of privilege in criminal cases." Most notably, it does not even appear in Rule 503(b)(1), outlining the general rule of privilege. Thus, if we were to follow the State's interpretation—viewing the phrase as a special restriction on the availability of the privilege in criminal cases—we would have to conclude that the rule was intended to provide lesser protection to persons accused of criminal offenses than those seeking a lawyer's help in non-criminal matters. But if anything, the use of the words "any other fact" in Rule 503(b)(2), the "Special rule of privilege in criminal cases," indicates the intent to provide greater, not lesser, protection to the criminally accused.

Our research shows widespread support for our interpretation of Rule 503,[1] but

---

1. *See, e.g.,* K. Brown (ed.), 1 *McCormick on Evidence* § 88 at 396 (6th ed. 2006) ("Communications in the course of preliminary discussion with a view to employing the lawyer are privileged though the employment is in the upshot not accepted."); S. Goode et al., 1 *Texas Practice Series: Guide to the Texas Rules of Evidence* § 503.4 at 415–16 ("Rule 503(a)(1) provides that even if the person or entity does not actually become a client of the attorney, the privilege attaches to communications made while consulting the lawyer with a view toward obtaining legal services. This accords with long-standing Texas law."); P. Rice, 1 *Attorney–Client Privilege in the Unit-* ed States § 2:2 at 10–12 (2d ed.1999) (rule provides "absolute" protection "regardless of whether litigation is pending, the attorney has been formally retained, or fees have been paid.").

*See also* Tex. Disciplinary R. Prof'l Conduct preamble ¶ 12:
Most of the duties flowing from the client-lawyer relationship attach only after the client has requested the lawyer to render legal services and the lawyer has agreed to do so ... But there are some duties, such as that of *confidentiality,* that may attach

nothing to support the State's argument that a person can benefit from the attorney-client privilege only after a lawyer has agreed to represent the client. The State relies almost exclusively on *Strong v. State*, 773 S.W.2d 543 (Tex.Crim.App. 1989). However, *Strong* is distinguishable from the case at bar. In *Strong*, both Danny Lee Strong and his girlfriend had been charged with murder. The trial court appointed two attorneys for each defendant. Thus, Strong knew from the very beginning which of the attorneys were supposed to represent him and which were supposed to represent his girlfriend; and there was no reason for him to expect his girlfriend's attorneys to be concerned about his particular interests, let alone owe him any duty of confidentiality. Nevertheless, Strong wrote a letter to one of these attorneys, trying to persuade him to use a version of the events on the night of the murder that would have been most favorable to both the defendants. *See id.* at 546. That attorney never responded to or otherwise acknowledged the receipt of the letter. Unbeknownst to Strong, the girlfriend had agreed to testify for the State. Being an "accomplice witness," however, "her testimony [was deemed to be] untrustworthy" and required corroboration. *Id.* at 547. As this Court noted, "the corroborating evidence need only tend to connect the defendant with the offense committed." *Id.* The girlfriend's attorneys turned over Strong's letter to the State;

and this letter, though not incriminating in itself, thus served to provide the corroboration necessary for the testimony of the prosecution's key witness in Strong's case.

Strong asserted the attorney-client privilege to prevent the State from using the letter. It is true, as the State in the present case points out, that the *Strong* court did observe that the attorney-client privilege is not a constitutional principle but merely an exclusionary rule of evidence that has been limited both by statutory exception and strict construction. *Strong*, 773 S.W.2d at 547–48. However, we relied primarily on the specific facts of that case, not on case law or statutory construction, to support our conclusion that there was no attorney-client relationship between the girlfriend's attorney and Strong. As we stated:

> [I]n light of the record showing the appointment of two attorneys to represent each defendant on February 14, 1986, coupled with evidence that Baldwin *never* communicated with [Strong] at *any* stage of his prosecution, it is clear that Baldwin was never [Strong's] attorney. Accordingly, the trial court was correct in finding that he was not.

*Id.* at 549 (Emphasis added).

Since the attorney never communicated with Strong, there was no way for Strong to know whether the attorney had received or read the letter, until the State produced

---

*before a client-lawyer relationship has been established.*

(Emphasis added.) It is true that the use of the word "shall" would have been much stronger than that of the permissive "may" in the above passage. However, a plain reading of the Texas Disciplinary Rule of Professional Conduct 1.05, Confidentiality of Information, suggests the possible reason for this permissiveness. Both the Texas Disciplinary Rule 1.05 and the Texas Rule of Evidence 503, which the Disciplinary Rule emulates, prohibit the use of the attorney-client privilege to

protect a client seeking a lawyer's assistance to commit a crime or fraud. There is no other exception to the privilege in either the Rules of Evidence or the Disciplinary Rules. Hence, the word "may," rather than "shall," is no doubt used because of this one possible exception to the availability of the privilege. Barring this exception, both the Evidence and the Disciplinary Rules impose a duty on the lawyer to preserve the confidentiality of his client's information, whether or not he or she has yet agreed to render legal services.

it as evidence. In short, it was a one-time, one-sided communication that clearly showed that Strong was not seeking the attorney's professional services. In contrast, in the present case, the State acknowledges that appellant's sole purpose in contacting Heckler was to persuade Heckler to represent him, if he were arrested and tried for Ramdhanny's murder. More importantly, the record shows that Heckler himself intended to represent appellant and that his only reason for inviting appellant to a meeting in the morning was to determine just how he might be able to do so. Finally, both parties agree that the two men did meet, in person, discussing the case at length and exploring the details of just how Heckler could help appellant. Thus, the facts of this case are distinguishable from *Strong,* and so is the applicable legal analysis.

The State argues that sound public policy requires that an attorney-client relationship exist before an attorney-client privilege can be recognized; otherwise, a defendant could call ten different lawyers, leave messages on their answering service, and then expect an attorney-client privi-

lege to attach to each of these messages. We disagree. The very fact that the hypothetical message is left on an answering machine, and is thus likely to be overheard by third parties, might serve to exclude the communication from the privilege.[2] Furthermore, the State's hypothetical is comparable to the *Strong* case, inasmuch as both involve a one-sided communication to a lawyer with whom the defendant had no prior relationship and no way of knowing if the lawyer even received his message. Hence, the defendant in the State's hypothetical is as unlikely to succeed as Strong was in invoking the attorney-client privilege.

Contrary to the State's assertions, our research indicates that allowing the privilege only after a contractual attorney-client relationship had already been established is not only contrary to the wording of the evidentiary rule, but it would also be unsound public policy.[3] Such a policy would have a chilling effect on defendants' willingness to be candid with the lawyers whose services they seek to obtain. *See* footnote 3, *supra.* Moreover, such a lack of candor on the potential client's part

---

**2.** *See, e.g.,* Rule 503(b)(1)(A-E) (applying the rule only to communications between the client and the lawyer and/or their representatives).

**3.** *See, e.g.,* P. Rice, 1 *Attorney–Client Privilege in the United States* § 2:3 at 14–15:

The purpose of the privilege in the United States has always been to encourage people to seek legal advice freely and to communicate candidly with the attorney during those consultations. The rationale is that, by protecting client communications designed to obtain legal advice or assistance, the client will be more candid and will disclose all relevant information to his attorney, even potentially damaging and embarrassing facts. Complete client disclosure helps to ensure quality legal advice and assistance and makes it possible for the client to better understand his obligations

and responsibilities under the law. This, in turn, will increase the law's effectiveness. (accompanying citations omitted). *See also* TEX. DISCIPLINARY R. PROF'L CONDUCT 1.5 & cmt: Comment: Confidentiality Generally

1. Both the fiduciary relationship existing between lawyer and client and the proper functioning of the legal system require the preservation by the lawyer of confidential information of one who has employed *or sought to employ* the lawyer. Free discussion should prevail between lawyer and client in order for the lawyer to be fully informed and for the client to obtain the full benefit of the legal system. The ethical obligation of the lawyer to protect the confidential information of the client not only facilitates the proper representation of the client but also encourages *potential clients* to seek early legal assistance. (Emphasis added).

would not be in the lawyer's best interest either, because the lawyer would then have to decide whether to represent a person before that person could feel free to give him or her all the information necessary to make that decision. Thus, public policy as well as normal rules of statutory construction dictate our holding today: that once Heckler started to elicit from appellant such incriminating information that a person would feel free to share only with his lawyer, he was bound by the same duties of confidentiality that a lawyer owes a client that he has agreed to represent, even though Heckler eventually decided not to represent appellant.

### Conclusion

We hold that the attorney-client privilege applies in cases where the record shows that the defendant consulted a lawyer with a view to obtaining legal services from him, even though the lawyer ultimately declined to represent the client. The State also argued before the court of appeals, however, that the Rule 503(d) crime-fraud exception to the attorney-client privilege applied, even if the privilege would have been otherwise applicable to this appellant. We therefore vacate the judgment of the court of appeals and remand the case to that court to address this remaining question.