**Luke Masood ARABZADEGAN,
Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 03–05–00465–CR.**

Court of Appeals of Texas,
Austin.

July 18, 2007.

Discretionary Review Refused
Dec. 5, 2007.

Alexander L. Calhoun, Austin, for Appellant.

M. Scott Taliaferro, Asst. Dist. Atty., Austin, for State.

Before Justices PURYEAR, WALDROP and B.A. SMITH.*

### *OPINION*

G. ALAN WALDROP, Justice.

Appellant Luke Masood Arabzadegan pleaded guilty to murder. He was convicted and sentenced by the court to forty-five years in prison. Arabzadegan appeals his conviction complaining that the district court improperly denied his motion to suppress a videotaped confession he gave to investigating officers shortly after his arrest. In a single point of error, he contends that the confession was the result of an interrogation conducted in violation of his right to counsel under the Sixth Amendment to the United States Constitution and Article I, section 10 of the Texas Constitution.[1] We affirm.

### *Factual and Procedural Background*

Andrew Scott Vigil was found dead in his home on November 26, 2002. His wrists and ankles had been bound with speaker cord. He had been blindfolded, gagged with socks, sprayed with pepper spray, and shocked several times with a stun gun. An autopsy revealed that he had suffocated as a result of a rolled-up sock stuffed into his mouth and tied there with the gag. The coroner ruled the death a homicide. Arabzadegan and two others were implicated in the crime by an anonymous tip. After investigating the tip, the Travis County Sheriff's Department obtained a warrant for Arabzadegan's arrest on December 5, 2002. The warrant was issued by a Travis County district judge based on a five-page affidavit detailing the crime and the evidence against the three men submitted by the lead investigator, Detective Russell Halvorsen. Both the affidavit and warrant accused Arabzadegan of capital murder.

Arabzadegan was arrested in the Austin area on December 12, 2002, at 4:10 p.m.[2] He was arrested at the apartment of a

---

* Before Bea Ann Smith, Justice (retired), Third Court of Appeals, sitting by assignment. *See* Tex. Gov't Code Ann. § 74.003(b) (West 2005).

1. Appellant does not contend that Article I, section 10 of the Texas Constitution provides broader protection with respect to the right to counsel than the Sixth Amendment. Conse-quently, we address his complaint in the context of Sixth Amendment jurisprudence.

2. Immediately after the crime, he and the other two men fled the Austin area and went to New Orleans. However, Arabzadegan's stay in New Orleans was brief and he returned to the Austin area at some point before December 12.

friend. At the time of the arrest, at least two other people were present in the apartment, a woman and a male friend of Arabzadegan's. Both were interviewed, but neither detained. After the arrest, Arabzadegan was driven immediately to the Travis County central booking facility, arriving at 4:50 p.m. He was then taken directly to an interrogation room before being booked into the computer system. In the interrogation room, Arabzadegan was read his *Miranda* warnings and supplied a "blue card" with the warnings written on it for him to read and sign. Arabzadegan then acknowledged the *Miranda* warnings, waived his rights, expressly declined the right to consult an attorney, signed the "blue card" acknowledging the waiver, and answered questions put to him by the officers in a manner that constituted a confession. The entire interview was videotaped and lasted an hour and ten minutes, concluding at approximately 6:00 p.m.

Arabzadegan filed a pretrial motion to suppress the confession. The trial court held a hearing and took evidence on the motion. Evidence at the hearing established that, after Arabzadegan became a suspect but before he was arrested, Detective Halvorsen received a telephone call from Austin criminal defense attorney Joe Turner. According to Detective Halvorsen, Turner indicated that either he or his firm "would probably be the attorneys of record" and "would be working on the case." [3] Josh Saegert, an attorney with Turner's firm, testified that, after Arabzadegan was arrested, Turner was notified and he sent Saegert to meet with Arabzadegan. [4] Saegert arrived at central booking sometime between 5:00 p.m. and 5:30 p.m. and demanded to see Arabzadegan. The sheriff's deputies at the front desk told Saegert that they did not have any record of Arabzadegan in their computer system. Saegert told the deputies that he believed Arabzadegan was in custody and demanded that they locate him so that Saegert could have access to him. The deputies provided Saegert with telephone numbers for Detective Halvorsen and the

**3.** The only evidence of this telephone conversation comes from the defense's cross-examination of Detective Halvorsen at the hearing on the motion to suppress. We quote the relevant portion of the testimony in its entirety.

 Q. Now, in that period where you knew he was a suspect but he hadn't yet been arrested, you got a call from Joe Turner; is that right?

 A. I recall—I think so, saying that he might have been retained as an attorney.

 Q. That the family contacted him and he had been retained as attorney. If it happened, That's what you remember?

 A. Well, I don't know if your client retained him or his family retained him.

 Q. Okay. So but you were aware that we were going to probably be the attorneys of record?

 A. I got a phone call from Joe Turner. Whether or not that was true or not, I don't know. Okay. At least that's what he told me. And I think Mr. Turner told me he hadn't been paid yet, so that doesn't mean a whole lot when you haven't been paid yet, as an attorney.

 Q. But, I mean the gist of the phone call was not about search or seizure or some kind of, like, legal issue; it was to indicate that we were going to be working on the case?

 A. That you, possibly, yes.

 Q. But there was—if there was a point to the phone call, that was it?

 A. That was it. That was the point.

Turner did not testify regarding the conversation. No other evidence regarding the conversation was offered by either the prosecution or the defense.

**4.** Saegert testified that Arabzadegan's family had retained the firm on December 9th or 10th. There was no evidence that Arabzadegan had any contact with the firm or its lawyers prior to his arrest. There was no evidence that Arabzadegan had agreed to retain Turner or his firm prior to his arrest.

head of the Major Crimes Unit, Lieutenant Art Cardenas. While he waited, Saegert telephoned Halvorsen, the sheriff's office dispatch (to talk to the arresting officer), and Cardenas and left messages. The message for Halvorsen was left at 5:38 p.m. at his Austin office [5], the message for the arresting officer was left at 5:45 p.m., and the message for Cardenas was left at 5:55 p.m. according to notes made by Saegert at the time. Lieutenant Cardenas returned Saegert's call at approximately 6:00 p.m. and confirmed that Arabzadegan was in custody. Saegert then met with Arabzadegan. However, the interrogation was over and the videotaped confession had been recorded.

The trial court denied Arabzadegan's motion to suppress the videotaped confession. Arabzadegan then pleaded guilty to the lesser included offense of murder and was sentenced by the court to 45 years' imprisonment.

Arabzadegan's complaint on appeal is that his videotaped confession was obtained in violation of his Sixth Amendment right to counsel, and the trial court should have granted his motion to suppress. More specifically, he argues that his waiver of counsel at the beginning of his interrogation was invalid because his Sixth Amendment rights had attached, he was represented by counsel at the time of the waiver, and he made the waiver without the benefit of counsel. *See Michigan v. Jackson,* 475 U.S. 625, 636, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986); *Upton v. State,* 853 S.W.2d 548, 553 (Tex.Crim.App.1993); *Holloway v. State,* 780 S.W.2d 787, 795 (Tex.Crim.App.1989). We conduct a two-step analysis to address this complaint. First, had Arabzadegan's Sixth Amendment rights attached at the time of the

interrogation? If not, then there is no constitutional violation. Second, if his Sixth Amendment rights had attached when he was interrogated, was his waiver of his right to counsel during the interrogation valid?

In reviewing a ruling on a motion to suppress, we give almost total deference to the trial court's determination of historical facts. *Balentine v. State,* 71 S.W.3d 763, 768 (Tex.Crim.App.2002). We review de novo mixed questions of law and fact that do not turn on an evaluation of credibility and demeanor. *Guzman v. State,* 955 S.W.2d 85, 89 (Tex.Crim.App.1997). We must affirm the trial court's ruling if it can be upheld on any valid theory of law applicable to the case—even if the trial court did not base its decision on the applicable theory. *See State v. Steelman,* 93 S.W.3d 102, 107 (Tex.Crim.App.2002).

### *Attachment of Sixth Amendment Rights*

We first determine whether Arabzadegan's Sixth Amendment right to counsel had attached at the time he was interrogated. The Sixth Amendment right to counsel attaches at the initiation of adversarial judicial proceedings whether by way of formal charge, preliminary hearing, indictment, information, or arraignment. *Brewer v. Williams,* 430 U.S. 387, 398, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) (quoting *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972) (plurality opinion)); *Robinson v. State,* 851 S.W.2d 216, 224 (Tex.Crim.App.1991). "[T]he Sixth Amendment guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a 'medium' between him and the State." *Maine v. Moulton,* 474 U.S. 159, 176, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985). After a

---

5. Halvorsen was in New Orleans at the time of the arrest and confession. He was made aware of the arrest when it occurred, but was unaware of the details of the interrogation until after the fact.

formal charge is made, a person ceases being a "suspect" and becomes an "accused." The government has committed itself to prosecute and formalized its adversarial position with respect to the defendant. *Kirby*, 406 U.S. at 689, 92 S.Ct. 1877. The defendant then "finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law." *Id.* The Supreme Court reiterated this point in *Moran v. Burbine:* "It is clear, of course, that, absent a valid waiver, the defendant has the right to the presence of an attorney during any interrogation occurring after the first formal charging proceeding, the point at which the Sixth Amendment right to counsel initially attaches." 475 U.S. 412, 425, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

Following this authority, Texas courts have held that adversarial judicial proceedings have commenced when a person is arrested pursuant to a warrant obtained through a complaint filed with a court. *See Barnhill v. State*, 657 S.W.2d 131, 132 (Tex.Crim.App.1983) (formal judicial criminal proceedings had been instituted against the accused by the filing of a felony complaint in justice court); *see also Green v. State*, 872 S.W.2d 717, 720 (Tex. Crim.App.1994) (noting that *Barnhill* is "consistent with, if not dictated by," United States Supreme Court authority to treat the filing of a felony complaint as a point after which adversarial judicial proceedings have commenced); *Terrell v. State*, 891 S.W.2d 307, 312 (Tex.App.-El Paso 1994, pet. ref'd); *Dams v. State*, 872 S.W.2d 325, 328 (Tex.App.-Beaumont 1994, no pet.). In this case, a felony complaint was submitted to a district court accusing Arabzadegan of capital murder and a warrant was issued for his arrest. The police then arrested Arabzadegan on the basis of this warrant and initiated an interrogation that resulted in a confession. We hold that the State initiated formal judicial proceedings against Arabzadegan with the filing of the felony complaint accusing him of capital murder. *Id.* Consequently, Arabzadegan's Sixth Amendment right to assistance of counsel had attached at the time of the interrogation, and he was entitled to the assistance of counsel prior to answering questions unless he validly waived such right. *Id.*

### Waiver of Right to Counsel

 There is no dispute that the officers who interrogated Arabzadegan apprised him of his right to counsel and delivered the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). There is also no dispute that after receiving these warnings Arabzadegan waived his right to counsel, both orally and in writing, before answering the officer's questions and confessing. However, this is not the end of the inquiry. We must determine whether the waiver is valid. The burden is on the State to prove that such a waiver was made voluntarily, knowingly, and intelligently. *Upton*, 853 S.W.2d at 553; *Robinson*, 851 S.W.2d at 224. Waiver is shown as a matter of law with regard to pretrial questioning if an accused (1) who has not yet retained or been appointed counsel (2) decides voluntarily not to rely on his right to counsel and (3) that decision is made with the understanding that he could remain silent and request a lawyer and that the State could use any statement he gave against him. *Robinson*, 851 S.W.2d at 224 (citing *Patterson v. Illinois*, 487 U.S. 285, 297, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988)). Thus, for a waiver to be valid not only must the waiver be made "voluntarily, knowingly, and intelligently," but the accused must also not have been represented by counsel at the time. *Id.* In *Patterson*, the Supreme Court made the point as follows:

We note as a matter of some significance that petitioner had not retained, or accepted by appointment, a lawyer to represent him at the time he was questioned by authorities. Once an accused has a lawyer, a distinct set of constitutional safeguards aimed at preserving the sanctity of the attorney-client relationship takes effect.

487 U.S. at 290 n. 3, 108 S.Ct. 2389.[6] The Texas Court of Criminal Appeals has interpreted this language as prohibiting the dissolution of an established attorney-client relationship through waiver without the involvement of counsel. *Holloway*, 780 S.W.2d at 794–95. Thus, once an accused's Sixth Amendment right to counsel has attached, if he is represented by counsel—whether retained or appointed by the court—the police may initiate interrogation only through notice to defense counsel, and a defendant's unilateral waiver of his Sixth Amendment right to assistance of counsel is invalid. *Upton*, 853 S.W.2d at 553; *Holloway*, 780 S.W.2d at 794–95; *see also Patterson*, 487 U.S. at 289, 108 S.Ct. 2389.

Arabzadegan argues that his waiver of the right to counsel prior to his interrogation was not valid because he was represented by criminal defense lawyer Joe Turner and his firm at the time of the waiver and his counsel was not notified of either the interrogation or the waiver.

There is no dispute that the police did not notify anyone as counsel for Arabzadegan prior to obtaining his waiver or conducting the questioning that resulted in a confession. Therefore, the relevant questions are whether Arabzadegan was, in fact, represented by counsel at the time of his waiver and whether the police had either actual or constructive notice that Arabzadegan was represented. If so, the waiver was ineffective and the confession inadmissible. If Arabzadegan was not represented by counsel or the police were not put on notice of the representation, the waiver was valid and the trial court's denial of the motion to suppress the confession was appropriate.[7]

■ The question of whether Arabzadegan was represented by retained counsel at the time of his interrogation and waiver of right to counsel turns on whether he had established an attorney-client relationship with Turner or a lawyer in his firm. *Plattenburg v. State*, 972 S.W.2d 913, 917 (Tex.App.-Beaumont 1998, pet. ref'd); *Terrell*, 891 S.W.2d at 313; *Dams*, 872 S.W.2d at 328. An attorney-client relationship is a contractual relationship and results from the mutual agreement and understanding of the parties concerned. To establish an attorney-client relationship, the parties must explicitly or by their conduct mani-

6. The court went on to note that "the analysis changes markedly once an accused even *requests* the assistance of counsel" citing *Michigan v. Jackson*, 475 U.S. 625, 106 S.Ct. 1404 (1986). *Patterson v. Illinois*, 487 U.S. 285, 290 n. 3, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988). There is no dispute in this case that Arabzadegan did not request assistance of counsel or otherwise attempt to invoke his Sixth Amendment rights during his interrogation.

7. The concurrence argues that an individual's Sixth Amendment right to counsel is a personal right and must be personally invoked by an accused in some fashion—i.e., the police must be on notice of the accused's desire for a lawyer or the fact that the accused has a lawyer—before a waiver based on *Miranda* warnings will be invalidated for failure to involve the lawyer. This may be the case. However, our determination that there is no evidence that Arabzadegan had an attorney-client relationship at the time of his interrogation is dispositive of this appeal and there is no need for us to reach the issue of how and by whom the Sixth Amendment right to counsel may be invoked.

fest an intention to create it.[8] *Hill v. Bartlette,* 181 S.W.3d 541, 547 (Tex.App.-Texarkana 2005, no pet.); *State v. DeAngelis,* 116 S.W.3d 396, 403 (Tex.App.-El Paso 2003, no pet.); *Stephenson v. LeBoeuf,* 16 S.W.3d 829, 836 (Tex.App.-Houston [14th Dist.] 2000, pet. denied); *Vinson & Elkins v. Moran,* 946 S.W.2d 381, 405 (Tex.App.-Houston [14th Dist.] 1997, writ dism'd by agr.); *Terrell,* 891 S.W.2d at 313; *Parker v. Carnahan,* 772 S.W.2d 151, 156 (Tex.App.-Texarkana 1989, writ denied). Thus, there must be evidence in the record upon which the trial court could have found that Arabzadegan and a lawyer with Turner's firm mutually agreed either expressly or by their conduct to establish an attorney-client relationship before Arabzadegan waived his rights and consented to give an inculpatory statement. *See Upton,* 853 S.W.2d at 556–57; *Plattenburg,* 972 S.W.2d at 917; *Terrell,* 891 S.W.2d at 313; *Dams,* 872 S.W.2d at 328.

The dissent argues that the creation of the attorney-client relationship in the criminal context should not be governed by the same contract-based rules as in other contexts. We are of the view that—with the exception of court-ordered appointments—the attorney-client relationship in the criminal context can only be created by a mutual agreement on the part of both the client and the lawyer. It does not make sense to speak of the existence of an attorney-client relationship where either of the parties concerned has not agreed to the relationship. In the context of a criminal matter where the lawyer is retained rather than appointed, a lawyer cannot be forced on an unwilling client nor can a client be forced on an unwilling lawyer. Thus, there must be a mutual understanding that both parties desire the relationship and intend it to exist. The contractual nature of the creation of the relationship in criminal matters other than court-ordered appointments, therefore, cannot differ from the creation of the relationship in other contexts. The Texas Court of Criminal Appeals has recognized the contractual nature of the creation of the attorney-client relationship in criminal matters (other than court-ordered appointments). *Mixon v. State,* 224 S.W.3d 206, 209–12 (Tex.Crim.App. 2007); *Upton,* 853 S.W.2d at 556–57; *Strong v. State,* 773 S.W.2d 543, 549 (Tex.Crim.App.1989); *Green v. State,* 667 S.W.2d 528, 533–34 (Tex.Crim.App. 1984). Other courts of appeals have adopted such an approach in the context of the Sixth Amendment. *Plattenburg,* 972 S.W.2d at 917; *Terrell,* 891 S.W.2d at 313; *Dams,* 872 S.W.2d at 328. We are not aware of any Texas court that has adopted a different standard for the creation of an attorney-client relationship in the criminal context other than for court-ordered appointments.

While it is common for third parties such as family members, friends, or others to help an accused retain the services of a lawyer either before or after arrest, an agreement between an accused's family

---

**8.** The issue in this case is whether Arabzadegan had *retained* counsel at the time of his questioning. Arabzadegan does not claim that he had either requested or been appointed counsel by the court at the time. His claim is that Turner and his firm were, in fact, his lawyers at the time of his arrest and interrogation because they had been retained by his family. It is significant that the rule regarding establishment of an attorney-client relationship when counsel is appointed by the court differs from the rule that applies when counsel is retained. *See Stearnes v. Clinton,* 780 S.W.2d 216, 222 (Tex.Crim.App.1989) (once an attorney is appointed an attorney-client relationship is established); *see also Holloway v. State,* 780 S.W.2d 787, 795 (Tex. Crim.App.1989) (an accused who has requested and had counsel appointed to represent him is represented by counsel for the purposes of the Sixth Amendment).

and a lawyer regarding possible representation does not, by itself, create an attorney-client relationship between that lawyer and the accused. This proposition was considered and rejected by the court in *Terrell.* *See* 891 S.W.2d at 313–14. We are of the same opinion. Until the accused reaches a mutual understanding with the lawyer there can be no attorney-client relationship. Otherwise, third parties could force their choice of a lawyer on an accused regardless of the wishes of the accused and possibly manipulate the process without the knowledge or involvement of either the accused or the State. For example, if third parties could create an attorney-client relationship on behalf of but without the involvement of an accused, criminal organizations or other participants in a crime could effectively nullify statements and/or confessions of their associates who are arrested and voluntarily decide to disclose information simply by contacting and retaining a lawyer on behalf of the associate. The attorney-client relationship cannot work this way for either ill-intentioned criminal associates or well-meaning family members.

We are aware of no authority supporting the notion that a family member or other third party may create an attorney-client relationship on behalf of a competent adult without the person's knowledge or consent.[9] To allow such agreements to bind an accused as well as government officials would abrogate the line of authority recognizing that the attorney-client relationship is a voluntary, contractual relationship resulting from the *mutual* agreement and understanding of the parties concerned. Mutuality is central to any contractual relationship including the attorney-client relationship. As articulated in *Parker v. Carnahan* and following cases, there must be evidence that both sides of such a relationship have agreed to it. *Parker,* 772 S.W.2d at 156. Evidence that one side may have intended there to be an attorney-client relationship does not prove an agreement, and therefore, does not prove an attorney-client relationship.

The attorney-client relationship, in a retained counsel situation, requires the agreement of both lawyer and client and cannot come into existence until the moment of the mutual understanding. A competent adult arrested and accused of a crime is absolutely entitled to reject any lawyer recruited by third parties. In other words, such an accused is free to enter into an attorney-client relationship of his or her choosing and at his or her option. This point can be illustrated by imagining that Arabzadegan had not wanted to retain Joe Turner's firm as his lawyers. If, after meeting with Saegert, Arabzadegan had decided not to retain Turner's firm, would there be any question that an attorney-client relationship ever existed between Arabzadegan and any member of Turner's firm? We do not think so and the reason would be Arabzadegan's failure to agree to it. The converse is also true. A lawyer, outside of the court-ordered appointment context, is entitled to provide services to a potential client at his or her option. No attorney-client relationship is created for the purposes of professional responsibility until the lawyer has agreed to it. *See Green,* 667 S.W.2d at 533 (attorney-client relationship not created when lawyer declined the representation after initial consultation). Thus, it is necessary for *both*

---

9. We are not presented in this case and do not consider issues that may arise with the formation of an attorney-client relationship where there is an established caretaker relationship such as parent and minor child, guardianship, etc., between the accused and a third party responsible for his or her interests. We address only the formation of an attorney-client relationship between an attorney and a competent adult.

lawyer and client to agree to the creation of the relationship before it can be said to exist. In this case, Arabzadegan, not even knowing of the existence of Saegert and Turner's firm until after his confession, could not possibly have agreed to an attorney-client relationship with them until after his confession.[10]

At the hearing on the motion to suppress, there was no evidence of an agreement or understanding between the lawyers and Arabzadegan prior to his initial meeting with Saegert. Indeed, there was no evidence of any intention on Arabzadegan's part to participate in an attorney-client relationship with anyone before his arrest or during his interrogation. There was no evidence that Arabzadegan retained Turner or was even aware that Turner had been or was going to be retained. Nor was there any evidence that Turner or another lawyer with his firm had any contact with Arabzadegan before Saegert met with him immediately after the interrogation.

---

10. The dissent suggests that an accused must be given a reasonable opportunity to knowingly decline the assistance of a lawyer recruited by third parties, and that the police in this case failed to give Arabzadegan such an opportunity by keeping the existence of the lawyer recruited by his family secret from him. Presumably, this means the police have a duty to inform an accused that a lawyer recruited by third parties is trying to see the accused (if they know this is happening) even if the accused has not requested an attorney or in any manner invoked his right to counsel. As articulated by the concurrence, this proposition is problematic. Nonetheless, the record in this case does not support the dissent's concern on this point.

There is no evidence in this record that the police kept the existence of Saegert secret from Arabzadegan. Saegert arrived at Travis County Central Booking and requested to see Arabzadegan sometime between 5:00 p.m. and 5:30 p.m.—after the interrogation had begun and was in progress. The request to see Arabzadegan was made to two sheriff's deputies on duty who were unaware of Arabzadegan's presence in the building. Their review of the records available to them did not disclose Arabzadegan's presence. Saegert asked to speak to a supervisor, and the deputies gave Saegert telephone numbers for Detective Halvorsen and Lieutenant Cardenas. Saegert called Detective Halvorsen and left a message for him at 5:38 p.m. Halvorsen was in New Orleans at the time and did not return the call. Saegert then called the Travis County Sheriff's Office dispatch and left a message for the arresting officer. According to Saegert's notes, he left this message at 5:45 p.m. Saegert then called Lieutenant Cardenas and left a message at 5:55 p.m., which Lieutenant Cardenas returned at approximately 6:00 p.m. Saegert was given immediate access to Arabzadegan, who had already given his statement. There is no evidence in this record of malfeasance on the part of either side. There is no evidence that anyone with the Travis County Sheriff's Office misled Saegert or that the interrogating officers were aware of Saegert's efforts before he spoke to Lt. Cardenas. Saegert was diligent in his efforts to see Arabzadegan and the police conducted their investigation in the ordinary way. Arabzadegan could have halted the process at any time by invoking his right to counsel or otherwise declining to give a statement, but he did not. There may be a case where intentional police misconduct in sequestering an accused raises additional constitutional issues. This is not that case.

The dissent's position highlights the lack of an attorney-client relationship between Arabzadegan and any lawyer at the time Arabzadegan gave his confession. While Arabzadegan had the right to counsel at the time of his interrogation, he also had the right to decline the assistance of counsel unless he already had a lawyer. There is no question that Arabzadegan knowingly and voluntarily declined the assistance of counsel. This waiver is valid unless an attorney-client relationship is in place at the time of the waiver. There is also no dispute that Arabzadegan was unaware of Saegert's existence or that Saegert planned to offer his services at the time he gave his statement. Arguing that the problem is that Arabzadegan should have been given an opportunity to decline the assistance of Saegert is to acknowledge that no attorney-client relationship existed between them at the time.

The only evidence offered was to the effect that (1) Arabzadegan's family contacted Turner before Arabzadegan had been found and asked Turner to serve as the lawyer whenever Arabzadegan was arrested, (2) Turner told a detective that he was going to do that, and (3) a lawyer from Turner's firm went to the police station to meet with Arabzadegan shortly after he was arrested. This evidence reveals something about the lawyer side of the required mutual understanding. However, it does not reveal anything regarding what Arabzadegan did or intended or agreed to with respect to retaining a lawyer and creating an attorney-client relationship. In short, there is no evidence in this record of any agreement—either express or by conduct—between Arabzadegan and a lawyer that establishes an attorney-client relationship between them at the time Arabzadegan waived his rights and confessed.

Although the burden is on the State to prove that a waiver of Sixth Amendment rights was voluntarily, knowingly, and intelligently made, this obligation cannot include requiring the State to prove that an accused *did not* have retained counsel at the time of an interrogation. Since the essence of a retained counsel attorney-client relationship is a mutual agreement between the lawyer and the accused, the evidence necessary to demonstrate or negate such a relationship is uniquely in the hands of the accused and his or her lawyer. If the State were obligated to negate any attorney-client relationship as part of demonstrating a voluntary waiver, either the information about an accused's relationship with his lawyer, including sensitive details about how and when the relationship was formed, would have to be subject to compulsory disclosure to the State or the court would have to deny the State the ability to secure the only evidence available to carry its burden in order to protect an accused's right to remain silent. Even if such disclosure or inquiry were allowed, proving that a mutual agreement between two adversarial parties *did not exist,* when the information needed is often unwritten and neither of the parties involved desires to disclose information about the relationship, would likely be not only an impossible burden, but also subject to many avenues of potentially fraudulent manipulation.

We are of the view that the better approach when an accused challenges the validity of a unilateral waiver of his or her Sixth Amendment right to counsel on the basis of the existence of an attorney-client relationship is to place the initial burden of showing the existence of such a relationship on the accused. This approach better matches the burden of proof to the source of the information necessary to carry the burden, avoids issues with the State seeking invasive discovery or inquiry in an area traditionally deemed confidential unless the accused elects to open the door, and avoids the complicated legal problem of requiring a party to prove a negative (that an attorney-client relationship does not exist). This does not abrogate or affect the prosecution's burden to prove that an accused's waiver of Sixth Amendment rights was knowing, voluntary, and intelligent on the part of the accused. Rather, if an accused wishes to invalidate an otherwise valid unilateral waiver by showing that an attorney-client relationship existed between him or her and an attorney when the waiver was made, but the accused failed to disclose the relationship to investigating officers at the time of the waiver, the burden will shift to the accused to put on evidence of the existence of the attorney-client relationship. If there is no evidence to support a finding that an attorney-client relationship existed at the time of an otherwise valid waiver of the Sixth

Amendment right to counsel or if the record is silent as to whether the accused had an attorney-client relationship at the time, then the waiver will not be invalidated on the basis that counsel was not involved.

The San Antonio Court of Appeals stated in *Cloer v. State* that in a Sixth Amendment waiver context "the State has the burden to prove that the attorney-client relationship had not been established" relying on language in the Texas Court of Criminal Appeals's opinion in *Upton v. State*. *Cloer v. State*, 88 S.W.3d 285, 289 (Tex.App.-San Antonio 2002, no pet.). The *Cloer* court apparently came to this conclusion because the *Upton* court-as part of its discussion finding that an attorney-client relationship did exist in that case-stated, "The State failed to carry its burden of proof on this issue." 853 S.W.2d at 557. There are two problems with the statement in *Cloer*.

First, the statement in *Cloer* regarding the burden of proof was not necessary to the analysis or the result in that case. The accused in *Cloer* had been appointed counsel. As noted previously, Texas law recognizes that, in the court-ordered appointment context, an attorney-client relationship is established for the purposes of the Sixth Amendment when an attorney is appointed to represent an accused. *See Stearnes*, 780 S.W.2d at 222; *see also Holloway*, 780 S.W.2d at 795. Thus, there was no real issue in *Cloer* as to whether the accused had an attorney-client relationship with a lawyer. Since it was undisputed that the accused in *Cloer* had a court-appointed attorney and, therefore, had an established attorney-client relationship, it was unnecessary for the *Cloer* court to offer any opinion on the questions of whether the accused had "accepted" the appointed lawyer as his attorney and whether the State had to prove that he had not.

Second, the *Cloer* opinion overstates the meaning of the language in *Upton* relating to the State's failure to carry its burden of proof. The accused and his lawyer in the *Upton* case testified regarding the existence of an attorney-client relationship at the time of the interrogation in that case. The State failed to cross-examine either the accused or his lawyer, or otherwise rebut this evidence. After noting this record, the *Upton* court stated, "The State failed to carry its burden of proof on this issue." 853 S.W.2d at 557. Was this a failure by the State to carry its burden of proof to negate the existence of an attorney-client relationship or was this a failure by the State to carry its burden to conclusively rebut the evidence put on by the accused? We believe the better reading of the *Upton* court's holding is that the State failed to carry its burden to rebut the evidence of an attorney-client relationship presented by the accused.

We do not believe that the Texas Court of Criminal Appeals intended *Upton* to require the State to negate the existence of an attorney-client relationship in all cases where a statement and/or confession is given after an otherwise valid waiver of rights. If so, in any case in which an uncounseled confession or statement is obtained after a waiver of rights, the defendant would simply have to move to suppress the statement claiming the waiver was invalid and then sit silent. The State would then have the obligation to prove not only that the waiver was made knowingly, voluntarily, and intelligently, but also that the accused did not have an attorney-client relationship with any lawyer at the time. Unless the State produces evidence negating the existence of any attorney-client relationship, the accused, without presenting any evidence that he had a lawyer, could claim that the statement must be suppressed because the

State failed to prove that he *did not* have a lawyer at the time of the confession. In such circumstances, the *absence of evidence* as to whether the accused had a lawyer at the time of the confession or statement would mean that the confession or statement must be suppressed. This would amount to a presumption that every accused or arrestee always has a lawyer. If we must presume that every arrested person has a lawyer, then no uncounseled confession or statement will be admissible unless the State conclusively rebuts that presumption. We do not believe that either the Sixth Amendment or the *Upton* opinion contemplates or requires such a presumption. Rather, in our view, the accused is required to raise a challenge to an otherwise valid waiver of Sixth Amendment rights by asserting the existence of an attorney-client relationship, and the accused also has the initial burden of persuasion with respect to the existence of such a relationship.[11] The State is then allowed to attempt to rebut that proof if there is a dispute.[12]

The fact that Arabzadegan entered into an attorney-client relationship with Turner's firm after the interrogation at issue is not relevant to the analysis. The Sixth Amendment protects the integrity of an established attorney-client relationship. It does not presume such a relationship. As the Supreme Court stated in *Patterson v. Illinois:*

> Preserving the integrity of an accused's choice to communicate with police only through counsel is the essence of *Edwards* [*v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)] and its progeny—not barring an accused from making an *initial* election as to whether he will face the State's officers during questioning with the aid of counsel, or go it alone. If an accused "knowingly and intelligently" pursues the latter course, we see no reason why the uncounseled statements he then makes must be excluded at his trial.

487 U.S. at 292, 108 S.Ct. 2389 (emphasis in original). Arabzadegan was free to have retained a lawyer before he was arrested and to rely on that lawyer to act as a medium between him and the State, or to have requested assistance of counsel before answering questions and confessing. In either event, the interrogating officers would have been obligated not to interfere with his efforts to exercise his right to assistance of counsel. *Moran*, 475 U.S. at 428, 106 S.Ct. 1135. However, there was no evidence he did either. He was, therefore, an accused who made the election to "go it alone" at the interrogation that resulted in his confession. *See Patterson*, 487 U.S. at 293, 108 S.Ct. 2389.[13] The fact

11. For example, as in *Cloer*, it would be enough for an accused who had an appointed lawyer at the time of a unilateral waiver of Sixth Amendment rights to show that the appointment occurred prior to the waiver. In a retained counsel scenario, the accused would be required to present evidence that he or she had an attorney-client relationship (i.e. a mutual understanding) with retained counsel at the time of an otherwise valid unilateral waiver.

12. Because we find that there is no evidence of an attorney-client relationship at the time of the waiver in this case and that this finding is dispositive, we express no opinion as to the

effect that an undisclosed, but later proven, retained counsel relationship might have on a unilateral waiver of Sixth Amendment rights.

13. The dissent argues that the result in this case is inconsistent with the United States Supreme Court's holding in *Moran v. Burbine*, noting that there had not been contact between the lawyer recruited by Burbine's sister and Burbine before he made the incriminating statement at issue in that case. *See Moran v. Burbine*, 475 U.S. 412, 417, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). However, *Moran v. Burbine* did not turn on the question of whether an attorney-client relationship existed between Burbine and the lawyer recruited

that he retained counsel after the waiver of rights and interrogation does not change the fact that he made the initial election to communicate with law enforcement without the assistance of counsel—a decision he was free to make on his own because he was a competent adult not represented by counsel at the time. *See Upton*, 853 S.W.2d at 553; *Holloway*, 780 S.W.2d at 794–95; *see also Patterson*, 487 U.S. at 289, 108 S.Ct. 2389.

Unless an attorney-client relationship existed between Arabzadegan and a lawyer with Turner's firm, Arabzadegan was free to unilaterally waive his Sixth Amendment right to assistance of counsel without notice to or the involvement of counsel, and he elected to do so. There is no evidence in this record that such an attorney-client relationship existed. We see no reason why his uncounseled confession must be excluded under these circumstances. Consequently, we hold that the trial court did not err in denying the motion to suppress.

We overrule Arabzadegan's point of error, affirm the order of the trial court denying Arabzadegan's motion to suppress, and affirm the trial court's judgment.

Concurring Opinion by Justice PURYEAR.

Dissenting Opinion by Justice B.A. SMITH.

DAVID PURYEAR, Justice, concurring.

I agree that Arabzadegan was not represented by counsel at the time of his confession and thus, with the exception of footnote 7, I join the majority opinion. I write separately because I believe that an accused must personally assert his right to counsel to invoke his Sixth Amendment right. I would hold that an accused has invoked his right to counsel under the Sixth Amendment only when he personally makes the request or somehow indicates to the police that he is already represented by counsel. Without such an assertion, I believe that an accused may validly waive his right to counsel under both the Fifth and Sixth Amendments even if counsel has been retained to represent him.

by his sister. The Court was very careful to point out that it was offering no opinion as to whether an attorney-client relationship existed or whether such a relationship would have any impact on the matter because the Court found that Burbine's Sixth Amendment right to counsel had not yet attached. *Moran*, 475 U.S. at 428–29, 106 S.Ct. 1135. Interestingly, the prosecution in *Moran* was willing to concede the existence of an attorney-client relationship at the relevant time for the purposes of its appeal to the United States Supreme Court even though the Rhode Island Supreme Court had expressly found as a matter of Rhode Island law no attorney-client relationship had existed. The United States Supreme Court would not accept the concession in light of the Rhode Island Supreme Court's interpretation of Rhode Island law. However, the Court noted that the question was not relevant to their decision in *Moran* stating that the issue before it did not "focus on whether an attorney-client relationship actu-

ally existed as a formal matter of state law." *Id.* at 429, 106 S.Ct. 1135. Rather, the outcome would be the same whether such a relationship existed or not because Burbine's Sixth Amendment rights had not attached. After stating that the question of whether an attorney-client relationship existed between Burbine and the lawyer recruited by his sister was irrelevant to their decision in that case, the Court went on to reject the notion that an attorney-client relationship—a creature of state law—could independently trigger the federal Sixth Amendment right to counsel. *Id.* The Court noted that the type of circumstances that would give rise to the Sixth Amendment right to counsel would certainly have a federal definition as opposed to relying on the creation of an attorney-client relationship pursuant to state law. *Id.* Thus, *Moran v. Burbine* not only does not aid in the analysis here, the opinion expressly declined to address the issue presented by this case.

The Sixth Amendment guarantees the accused the right to "rely on counsel as a 'medium' between him and the State." *Maine v. Moulton*, 474 U.S. 159, 176, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985). If invoked, the police must respect the accused's choice to seek counsel and must not act in a manner that dilutes the protection afforded by the right, and it is a violation of the Sixth Amendment for the police to *knowingly* circumvent the accused's right to have counsel present during "a confrontation between the accused and a state agent." *Id.* at 171, 176, 106 S.Ct. 477. "If an accused is interrogated after the right to counsel has attached, and a statement obtained, the police may not use that statement against the accused unless counsel was present or waived when the statement was obtained." *Robinson v. State*, 851 S.W.2d 216, 224 (Tex.Crim.App. 1991).

If the police interrogate an individual after he asserts his right to counsel and after his Sixth Amendment right has attached, "any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." *Michigan v. Jackson*, 475 U.S. 625, 636, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986). "Just as written waivers are insufficient to justify police-initiated interrogations after the request for counsel in a Fifth Amendment analysis, so too they are insufficient to justify police-initiated interrogations after the *request for counsel* in a Sixth Amendment analysis." *Id.* at 635, 106 S.Ct. 1404 (emphasis added).

In determining whether an accused has waived his Sixth Amendment right, courts should "indulge every reasonable presumption against waiver." *Id.* at 633, 106 S.Ct. 1404. As a result, the burden of establish-

ing a valid waiver falls on the State. *Id.; Upton v. State*, 853 S.W.2d 548, 553 (Tex. Crim.App.1993) (holding that burden is on State); *see also Robinson*, 851 S.W.2d at 224 (holding that burden of showing that waiver of counsel was made "voluntarily, knowingly, and intelligently" falls on State). However, in determining whether the right was validly waived, the key inquiry is whether the accused was "made sufficiently aware of his right to have counsel present during the questioning, and of the possible consequences of a decision to forgo the aid of counsel." *Patterson v. Illinois*, 487 U.S. 285, 292–93, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988). Waiving the right to an attorney after being given *Miranda* warnings can constitute an effective waiver of the Sixth Amendment right. *See id.* at 293, 296, 298, 108 S.Ct. 2389. "Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements . . ., the analysis is complete and the waiver is valid as a matter of law." *Id.* at 297, 108 S.Ct. 2389; *see also Robinson*, 851 S.W.2d at 224 (holding that waiver is shown as matter of law if accused "(1) who has not yet retained or been appointed counsel (2) decides voluntarily not to rely on his right to counsel and (3) that decision is made with the understanding that he could remain silent and request a lawyer and that the State could use any statement he gave against him" (citations omitted)).

I believe that the Sixth Amendment right to counsel, as expressed by the plain language of the amendment and by the opinions dealing with it, is a personal right of the accused and may not be invoked by an attorney or anyone else on behalf of the accused.[1] *See* U.S. Const. amend. VI ("ac-

---

1. The dissent states that by concluding that the Sixth Amendment must be personally in-

voked, I have "effectively equate[d] the Sixth Amendment right with the Fifth Amendment

*cused shall enjoy the right* to ... Assistance of Counsel" (emphasis added)). Further, I believe that to properly invoke the right, the accused must assert his right to counsel or inform the police in some manner that he has retained counsel. *See Plattenburg v. State*, 972 S.W.2d 913, 916 (Tex.App.-Beaumont 1998, pet. ref'd) (holding that confession was not obtained in violation of Sixth Amendment and noting that Plattenburg did not tell officers that he had or wanted legal representation); *Terrell v. State*, 891 S.W.2d 307, 314 (Tex.App.-El Paso 1994, pet. ref'd) (concluding that there was no Sixth Amendment violation and noting that accused never mentioned prior relationship with attorney or that he believed that he was represented).

Although the burden is on the State to prove a valid waiver of the right, I believe that the State's burden is only to demonstrate that the waiver was made voluntarily and knowingly, not to demonstrate that no attorney-client relationship actually existed. If the State demonstrates (1) that the accused voluntarily waived his right to counsel after being properly informed of his rights and (2) that, prior to and during the interrogation, an accused did not mention that he wanted to speak to a lawyer, that he had a lawyer, or that he asked someone to hire him a lawyer, then I believe that the State has satisfied its burden. *Cf. Patterson*, 487 U.S. at 297–98, 108 S.Ct. 2389 (rejecting argument that it is more difficult to waive Sixth Amendment right to counsel than to waive Fifth Amendment right).

I believe that requiring a personal invocation of the right is consistent with the

history of the right and properly balances the various interests at stake. First, the language in the cases concerning the right to counsel under both the Fifth and Sixth Amendments demonstrates that the right to counsel is something that the accused must assert to be effective. A good example of this is found in *Patterson v. Illinois.* In *Patterson*, the Supreme Court concluded that an individual's waiver of his right to an attorney after being given the *Miranda* warnings constituted a valid waiver under the Sixth Amendment. 487 U.S. at 296, 108 S.Ct. 2389. In making its decision, the Court noted "as a matter of some significance that the *petitioner* had not retained, or accepted by appointment, a lawyer to represent him at the time he was questioned." *Id.* at 290 n. 3, 108 S.Ct. 2389 (emphasis added). Indeed, the Court stated that the "[p]*etitioner* ... at no time sought to exercise his right to have counsel present" and that had the "*petitioner indicated* he wanted the assistance of counsel, the authorities' interview would have stopped, and further questioning would have been forbidden." *Id.* at 290–91, 108 S.Ct. 2389 (emphasis added). In discussing the applicability of prior Fifth Amendment precedent in the Sixth Amendment context, the Court stated that the essence of prior cases concerning the right to counsel is "[p]reserving the integrity of an *accused's choice*" to interact with police through his attorney or to "go it alone." *Id.* at 291, 108 S.Ct. 2389 (emphasis added). The Court reasoned that if an accused "knowingly and intelligently" decides to go it alone, "we see no reason why the uncounseled statements he then makes must be excluded at his trial." *Id.*[2]

right." I disagree. Although I believe both rights must be personally invoked, I also recognize that the rights apply in different contexts and provide fundamentally different protections and privileges.

2. In a footnote to its opinion in *Patterson*, the Supreme Court commented on the possibility that the police might interfere with the attorney-client relationship. Footnote nine reads, in relevant part, as follows:

Similar statements were also made by the court of criminal appeals in *Holloway v. State*, 780 S.W.2d 787 (Tex.Crim.App. 1989), and *Lucas v. State*, 791 S.W.2d 35 (Tex.Crim.App.1989). When deciding whether an attorney-client relationship existed in *Holloway*,[3] the court reasoned that "[*i*]*nvocation of counsel is therefore essential* to bar further police contact with a suspect in the Fifth Amendment context or an accused in the *Sixth Amendment* context." 780 S.W.2d at 790 (emphasis added). Further, the court explained that the decisions in *Edwards* and *Jackson* were concerned with providing "an *accused* or suspect—not the attorney—with the means by which he may effectuate a decision to not deal with authorities alone." *Id.* (emphasis added).

Although *Lucas* involved the Fifth and not the Sixth Amendment, the court made similar statements regarding an individual's burden to invoke the right to counsel. In *Lucas*, the court had to determine, in part, whether an attorney, who had never met with the accused, could effectively invoke the accused's Fifth Amendment right to counsel on behalf of the accused and stop an interrogation. *See generally* 791 S.W.2d 35. The lawyer faxed a letter to the sheriff's department, purporting to invoke Lucas's Fifth Amendment right. *Id.* at 47. The court stated that it would be counterproductive to "allow counsel to invoke the constitutional protection on behalf of a criminal defendant who has not yet met with counsel and has *not himself expressed a desire to invoke that protection.*" *Id.* (emphasis added). Further, the court stated that "[t]he right to counsel is considered *invoked* where a *person indicates he* or *she* desires to speak to an attorney or have an attorney present." *Id.* at 45 (emphases added); *see also Jackson*, 475 U.S. at 633, 636, 106 S.Ct. 1404 (holding that courts are required to give "a broad, rather than a narrow, interpretation to a *defendant's request* for counsel," and, as in Fifth Amendment context, "the *assertion* is no less significant, and the need for additional safeguards no less clear, when the *request* is made at an arraignment and when the basis for the claim is the Sixth Amendment"; further holding that if police initiate interrogation after "a *defendant's assertion* " of right to counsel, waiver is ineffective (emphases added)); *Moran v. Burbine*, 475 U.S. 412, 426, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) (holding that *Miranda* gives "the *defendant* the power to exert some control over the course of the interrogation"); *Moulton*, 474 U.S. at 170, 176, 106 S.Ct. 477

---

[W]e have permitted a *Miranda* waiver to stand where a suspect was not told that *his lawyer* was trying to reach him during questioning; in the Sixth Amendment context, this waiver would not be valid.
*Patterson v. Illinois*, 487 U.S. 285, 297 n. 9, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988) (emphasis added). This comment has no bearing on the facts of this case. First, the statement presupposed that an attorney-client relationship was in existence when it stated that the *accused's* attorney was trying to reach him. There is no indication that Arabzadegan formed an attorney-client relationship with either Turner or Saegert. Second, I do not read that statement to mean that there is no duty imposed on the accused to indicate to the police, in some manner, that he would like to be appointed counsel, has retained counsel, or thinks that counsel may have been retained for him. If the police prevented an accused's attorney from seeing the accused after he made any of these types of statements, then any waiver of his right to counsel would indeed be invalid.

3. After being appointed an attorney, Holloway was questioned by the police. *Holloway v. State*, 780 S.W.2d 787, 789 (Tex.Crim.App. 1989). The court concluded that the right to counsel had attached, that the attorney-client relationship had been established, and that, therefore, the unilateral waiver of his right to counsel without his counsel being present was invalid. *Id.* at 796.

(holding that once "the right to counsel has attached and *been asserted,* the State must" honor it; also holding that State has obligation "not to act in a manner that circumvents the protections accorded the accused by *invoking this right* " (emphases added)).

In addition, the analysis in *Moran v. Burbine,* although limited to the Fifth Amendment context, strongly indicates that the right to counsel is something that an individual must assert to be effective and seems to have equal applicability in the Sixth Amendment context.[4] In *Moran,* the Supreme Court had to determine whether the failure of law enforcement to inform an accused that a public defender had called the police station on his behalf violated his Fifth Amendment right to an attorney. Burbine's sister called the public defender's office to try to obtain assistance for Burbine, but Burbine did not realize that his sister was trying to get him an attorney. 475 U.S. at 416–17, 106 S.Ct. 1135. The attorney called the police station and informed the police that Burbine was represented by counsel. *See id.* at 417, 106 S.Ct. 1135. The police interrogated Burbine shortly after the phone call without the attorney being present. *Id.*

In reaching its conclusion that Burbine validly waived his right to counsel after being given the *Miranda* warnings, the Court reasoned as follows:

Events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the

capacity to comprehend and knowingly relinquish a constitutional right.... No doubt the additional information would have been useful to respondent; perhaps even it might have affected his decision to confess. But we have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights. Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law.

*Id.* at 422–23, 106 S.Ct. 1135 (citations omitted). Further, the Court stated that the withholding of information "is only relevant to the constitutional validity of a waiver if it deprives a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *Id.* at 423–24, 106 S.Ct. 1135. In addition, the Court concluded that it was unwilling to adopt a rule that required the police to inform a suspect of the efforts of an attorney to reach him. *Id.* at 425, 106 S.Ct. 1135. Finally, the Court stated that it was unwilling to expand the requirements listed in *Miranda* to include a requirement that the police "keep the suspect abreast of the status of his legal representation." *Id.* at [5]

---

4. Burbine also contended that his Sixth Amendment rights were violated by the trial court's failure to exclude his inculpatory statements. *Moran v. Burbine,* 475 U.S. 412, 428, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). However, the Court concluded that because the interrogation took place before the initiation of adversary judicial proceedings, his Sixth Amendment right to counsel had not attached and, therefore, no violation could

have occurred. *See id.* at 425, 430–32, 106 S.Ct. 1135.

5. In *Moran,* the Court did say that "once the right has attached, it follows that the police may not interfere with the efforts of the *defendant's attorney* to act as a 'medium' between [the suspect] and the State' during the interrogation." *Moran,* 475 U.S. at 428, 106 S.Ct. 1135 (emphasis added and removed) (quoting

Additionally, the need for simplicity and a bright-line rule also weighs in favor of requiring an individual to invoke the right to counsel for himself. In *Miranda*, the Court stated that one of the purposes of its holding is "to give concrete constitutional guidelines for law enforcement agencies and courts to follow." 384 U.S. at 441–42, 86 S.Ct. 1602. It is consistently expressed in the case law interpreting *Miranda* that, due to its simplicity, the bright-line rule adopted by the Supreme Court is helpful to both the State and the accused. *See, e.g., Arizona v. Roberson*, 486 U.S. 675, 680, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988) (opining that one of principal advantages of *Miranda* is "the ease and clarity of its application"); *New York v. Quarles*, 467 U.S. 649, 657–58, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984) (noting that to preserve clarity of its holding, Court has refused to expand *Miranda's* holding despite repeated requests); *Fare v. Michael C.*, 442 U.S. 707, 718, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979) (explaining that holding in *Miranda* "has the virtue of informing police and prosecutors with specificity as to what they may do in conducting custodial interrogation, and of informing courts under what circumstances statements obtained during such interrogation are not admissible"; specifying that "gain in specificity" outweighs burdens imposed by *Miranda* ). A bright-line rule in the Sixth Amendment context will aid the police because it clearly informs them when the Sixth Amendment right to counsel is invoked and therefore when the interrogation must stop. This provides the assur-

ance that admissions obtained through questioning will not later be deemed inadmissible despite the fact that the police believed that they had satisfied all the necessary prerequisites to question an accused. Finally, it would aid courts in determining whether a confession was obtained in violation of the accused's Sixth Amendment right to counsel.

A contrary rule provides no guidance as to what actions the police should engage in when a lawyer asserts that he is invoking an accused's Sixth Amendment right while the accused is being questioned, but the accused has made no indication that he had retained or wanted to employ the services of an attorney. If the lawyer's statements are treated as fully invoking the right, then it stands to reason that simply obtaining another confirmation from the accused that he did not want to have the assistance of counsel would be insufficient to constitute a valid waiver. *See Holloway*, 780 S.W.2d at 795 (holding that if valid attorney-client relationship exists and Sixth Amendment right has attached, relationship may not be dissolved in absence of counsel); *see also Upton*, 853 S.W.2d at 553 (holding that where attorney-client relationship exists, accused's unilateral waiver of right to counsel is invalid for Sixth Amendment purposes). Rather, it would seem that despite the fact that the accused never asked for a lawyer, the police would have to allow the lawyer or another lawyer to consult with the accused in order to obtain a valid waiver. Requiring this type of unsolicited and yet mandatory consulta-

*Maine v. Moulton*, 474 U.S. 159, 176, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985)). However, the Court did not say that the actions of the attorney in *Moran* would be enough to establish an attorney-client relationship for Sixth Amendment purposes, nor did it say that there was no requirement that the accused notify the police or indicate in some way that he is or may be represented by counsel to

properly invoke the Sixth Amendment right. Further, in describing the importance of the Sixth Amendment, the Court stated that the "Sixth Amendment's intended function is not to wrap a protective cloak around the attorney-client relationship for its own sake any more than it is to protect a suspect from the consequences of his own candor." *Id.* at 430, 106 S.Ct. 1135.

tion with an attorney fails to consider the possibility that there are situations, including domestic disputes and organized criminal activity, in which an accused might legitimately not want to speak with or employ the services of an attorney hired by another individual.

If the lawyer's statement is treated as something less than a complete invocation of the right, an assertion without any support in this area of the law, it is even more unclear what procedures would have to be employed to ensure that an accused has validly waived his right to counsel. It is possible that simply asking the accused whether he would like to employ the services of the attorney and obtaining a negative response would be enough to allow the police to continue questioning the accused. But even this result raises the question of why this waiver would be more effective than the general waiver obtained before questioning began.

Moreover, neither approach provides for a simple determination of what portion of an accused's statement would be deemed admissible and what portion would be deemed to have been obtained in violation of the Sixth Amendment. If it is incumbent upon the accused to invoke the right, then the determination is clear from the record: any statement made in the absence of counsel after an individual has invoked the right to counsel is inadmissible. This same type of clarity is not possible when the individual asserting the right to counsel is not in the same location as the accused.

In addition, neither approach affords the proper respect to an accused's decision to forego the assistance of counsel and submit to questioning that the choice should be given. For whatever reason an accused decides to waive his right to counsel, either good or ill, it is his decision to make, and courts should be extremely cautious before

they allow other people's concerns about the best interest of the accused to outweigh his own determination. *See Lucas,* 791 S.W.2d at 49 (concluding that Lucas did not invoke his right to counsel and that "[t]o hold otherwise would be to refuse to grant proper respect to *appellant's own desire* to confess his criminal conduct on his own terms" (emphasis added)).

Although he made no personal invocation of his right to counsel, Arabzadegan insists that his confession was obtained in violation of that right. Further, he contends that if we conclude that his Sixth Amendment rights were not violated, our holding will be contrary to prior precedent and will lead to unfavorable results. Specifically, he argues that it would allow the police to question an accused who has requested that counsel be appointed on his behalf as long as the police question the accused between the time the request is made and the time the attorney actually consults with the accused. This argument ignores the distinction present in his hypothetical that, by requesting that counsel be appointed, the accused personally invoked his right to an attorney and has made this desire known to a governmental body. This fact situation was previously addressed by the Supreme Court in *Michigan v. Jackson.* In *Jackson,* the appellants requested the appointment of counsel, were questioned by police after making the request, and gave inculpatory statements. *See* 475 U.S. at 627, 106 S.Ct. 1404. In deciding that the statements were obtained in violation of the appellants' Sixth Amendment rights, the Supreme Court stated:

> Sixth Amendment principles require that we impute the State's knowledge from one state actor to another. For the Sixth Amendment concerns the confrontation between the State and the individual. One set of state actors (the

police) may not claim ignorance of *defendants' unequivocal request for counsel* to another state actor (the court).

*Id.* at 634, 106 S.Ct. 1404 (emphasis added).

The *Jackson* case is much different than the one here. The appellants in *Jackson* specifically asked for the appointment of counsel, and the Supreme Court rightly concluded that it would be unfair to allow an accused's request for counsel to a governmental official be rendered a nullity by

allowing other governmental employees to question the accused. Arabzadegan never asked to speak to an attorney or to have an attorney appointed for him. If he had made either of those requests, knowledge of that request would properly be imputed to all police officers.[6]

To be effective, Arabzadegan's argument also requires that knowledge of a statement made by someone other than the accused be instantaneously imputed to all

---

**6.** Relying on *Jackson,* the dissent places a great deal of importance on the idea that knowledge of the two attorneys' statements to the police that they might be representing Arabzadegan should have been imputed to all police officers. However, in making this assertion, the dissent ignores the fact that the imputation of knowledge of an attorney-client relationship has only been allowed in two distinct circumstances, neither of which apply to the circumstances of this case.

The first situation occurs when an accused has requested that an attorney be appointed to represent him in a criminal proceeding. *See Michigan v. Jackson,* 475 U.S. 625, 634, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986); *see also Smith v. State,* 828 S.W.2d 495, 496 (Tex.App.-El Paso 1992, no pet.) (holding that interrogation by police after Smith requested appointment of counsel from county employee responsible for obtaining appointments violated Sixth Amendment and further holding that request to one state employee must be imputed to other state actors); *Alford v. State,* 788 S.W.2d 436, 438–39 (Tex.App.-Houston [1st Dist.] 1990, no pet.) (noting that Alford requested attorney from magistrate and holding that his subsequent interrogation by police violated Sixth Amendment). There are significant policy reasons favoring the rule requiring imputation of an accused's request for counsel. Primarily, the rule ensures that an accused's request for counsel is given the respect that the invocation of a constitutional right of this import should be given. It allows the accused the benefit of only having to assert the right once to have the full protections afforded by the right. Moreover, a contrary rule would allow the police to sidestep an accused's invocation of his right to counsel simply by sending in police officers who had no knowledge of the prior request to obtain a

waiver and continue questioning the accused and would, thereby, effectively render an accused's Sixth Amendment right to counsel a nullity. These policy considerations are not present where, as here, an accused never communicated that he wanted the protections of the Sixth Amendment and waived his right to counsel but others attempted to invoke that right on his behalf.

The second circumstance in which knowledge concerning an attorney-client relationship has been imputed to state actors occurs when an accused fails to invoke his right to counsel but the court appoints an attorney to represent the accused because the very nature of the crime charged or the severity of the potential punishment that could be imposed necessitates the benefit of counsel. *See Miranda v. Arizona,* 384 U.S. 436, 471, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (holding that where assistance of counsel is constitutionally required, right to be provided counsel does not depend on request); *Holloway* 780 S.W.2d 787 (explaining that although accused did not invoke his right to counsel, he was appointed counsel to represent him in his capital-murder trial, and his waiver of right to counsel in absence of counsel was, therefore, invalid); Tex.Code Crim. Proc. Ann. art. 26.052 (West Supp.2006) (requiring appointment of counsel in death-penalty cases). Although I believe that the Sixth Amendment right to counsel is deemed invoked in situations where the law requires the appointment of an attorney regardless of express invocation by the accused, there is no such law applicable to the circumstances present in this case, and I, therefore, cannot ignore the fact that Arabzadegan never invoked his right to counsel and voluntarily chose to submit to police questioning unaided by the advice of counsel.

police officers. His argument would require imputation of the knowledge that an attorney had asked police officers at the front desk of the police station about Arabzadegan to the officer contemporaneously questioning Arabzadegan. The record indicates that Arabzadegan's inculpatory statements were obtained at nearly the same time that a lawyer came to the police station stating that he was Arabzadegan's attorney. Moreover, the record also reflects that the officers at the front desk made diligent efforts to try and locate Arabzadegan and to provide the lawyer with the contact information of various police officers involved in the case. *Cf. Plattenburg,* 972 S.W.2d at 916 (when determining that no Sixth Amendment violation occurred, court noted that officer who actually took statement from Plattenburg was unaware that lawyer was at police station looking for him). In light of the fact that the record fails to show any dilatory tactics by the police, instantaneously imputing knowledge given to an officer at the front desk to officers questioning an accused and thus rendering the confession obtained from Arabzadegan inadmissible would greatly distort the holding of *Jackson* and its progeny.

In support of his argument, Arabzadegan also relies on *Upton v. State.* He argues that this case supports his position that information indicating the possibility of an attorney-client relationship that is given to the police by sources other than the accused will render any waiver of counsel invalid for Sixth Amendment purposes. In *Upton,* a family member asked an attorney to go to the police station and talk to Upton. 853 S.W.2d at 554 n. 3. The attorney met with Upton at the police station for an extended period of time and advised Upton not to talk to anyone. *Id.* The attorney informed the police that he told Upton not to make a statement and that he either was or would be represent-

ing Upton. *Id.* at 554, 556. After the attorney left, the police began to question Upton. *Id.* at 554. While being questioned by the police, Upton said that the attorney told him not to talk to the police, and one of the interrogating officers told Upton, "Well he may be your lawyer, he's your employee, you know. It's up to you." *Id.* Subsequently, Upton made self-incriminating statements. *Id.* The court concluded that the incriminating statements were obtained in violation of the Sixth Amendment. *Id.* at 557–58.

The *Upton* case is distinguishable from the present case. In that case, the State "failed to carry its burden." *Id.* at 557. Upton mentioned at the beginning of the interrogation that a lawyer had advised him not to talk to anyone, and the police even described the attorney as Upton's attorney during the interrogation. Yet the police failed to ascertain whether Upton was represented by counsel. Moreover, they attempted to obtain a waiver of the right to counsel even though they believed that Upton was represented. In light of these facts, the police failed to demonstrate that the waiver was valid.

For all the preceding reasons, I would conclude that the protections afforded by the Sixth Amendment are invoked only when the *accused* asserts his right to counsel. Because there is no indication in the record that Arabzadegan ever asked to consult with an attorney, I concur in the judgment of the Court.

BEA ANN SMITH, Justice, dissenting.

There is no question that Luke Arabzadegan attempted to waive his right to counsel when he gave his statement to the police. Arabzadegan asserts, however, that the attempted waiver was invalid, and that his confession was obtained in violation of his Sixth Amendment right to coun-

sel, because the State was on notice that he was represented by counsel before he was interrogated.

Justice Waldrop's majority opinion concludes that the interrogation was proper because Arabzadegan failed to prove that he had an attorney-client relationship with the attorneys who contacted the sheriff's office on his behalf. Justice Puryear, in his concurring opinion, also concludes that the interrogation was proper because Arabzadegan did not personally invoke his right to counsel. With all due respect to my colleagues, I find neither of these opinions persuasive. Believing that Arabzadegan's Sixth Amendment right to counsel was violated, I dissent.

## I.

"In all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI.

The right to the assistance of counsel guaranteed by the Sixth and Fourteenth Amendments safeguards the other rights deemed essential for the fair prosecution of a criminal proceeding. *Maine v. Moulton,* 474 U.S. 159, 168–69, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985). Recognizing that a layman accused of a crime is incapable of effectively representing himself, the amendment guarantees an accused "the right to rely on counsel as a 'medium' between him and the State." *Id.* at 176, 106 S.Ct. 477. "The Sixth Amendment ... imposes on the State an affirmative obligation to respect and preserve the ac-

cused's choice to seek this assistance.... [A]t the very least, the prosecutor and police have an affirmative obligation not to act in a manner that circumvents or dilutes the protection afforded by the right to counsel." *Id.* at 171, 106 S.Ct. 477.

Because the right to the assistance of counsel is shaped by the need for the assistance of counsel, the right attaches at the initiation of adversarial judicial proceedings and applies to all critical stages of the criminal justice process. *Fellers v. United States,* 540 U.S. 519, 523, 124 S.Ct. 1019, 157 L.Ed.2d 1016 (2004); *Moran v. Burbine,* 475 U.S. 412, 429, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986); *Green v. State,* 872 S.W.2d 717, 719 (Tex.Crim.App.1994). All members of the panel agree that Arabzadegan's Sixth Amendment right to counsel had attached at the time he was interrogated. *See Burbine,* 475 U.S. at 428, 106 S.Ct. 1135; *Green,* 872 S.W.2d at 720; *Upton v. State,* 853 S.W.2d 548, 556 (Tex. Crim.App.1993); *Barnhill v. State,* 657 S.W.2d 131, 132 (Tex.Crim.App.1983).

## II.

Relying on the opinion in *Terrell v. State,* 891 S.W.2d 307, 313–14 (Tex.App.-El Paso 1994, pet. ref'd), the majority asserts that the Sixth Amendment right to counsel requires a contractual attorney-client relationship. *See also Plattenburg v. State,* 972 S.W.2d 913, 917 (Tex.App.-Beaumont 1998, pet. ref'd); *Dams v. State,* 872 S.W.2d 325, 328 (Tex.App.-Beaumont 1994, no pet.).[1] The majority opinion concludes

---

1. Both *Plattenburg* and *Dams* rely on the questionable authority of *Lucas v. State,* 791 S.W.2d 35, 47–48 (Tex.Crim.App.1989). *See Plattenburg v. State,* 972 S.W.2d 913, 917 (Tex.App.-Beaumont 1998, pet. ref'd); *Dams v. State,* 872 S.W.2d 325, 328 (Tex.App.-Beaumont 1994, no pet.). In *Lucas,* the court of criminal appeals stated that "it would be counterproductive to our system of justice ...

to allow counsel to invoke the [Sixth Amendment] constitutional protection on behalf of a criminal defendant who has not yet met with counsel and has not himself expressed a desire to invoke that protection." 791 S.W.2d at 47. As authority for this holding, the court of criminal appeals improperly relied on its opinions in *Holloway v. State* and *Dunn v. State. See Lucas,* 791 S.W.2d at 47 (citing

that Arabzadegan's situation does not come within the scope of the Sixth Amendment's protection because Arabzadegan did not prove that he had established, expressly or by conduct, a mutually binding contract for legal services with Joe Turner's law firm before the interrogation began.[2] This conclusion is both inconsistent with established authority and contrary to the interests served by the Sixth Amendment.

The notion that the Sixth Amendment protects only an attorney-client relationship formed under contract law principles is contrary to the opinion of the United States Supreme Court in *Burbine*. Burbine was arrested on a burglary charge and became a suspect in an unrelated murder. 475 U.S. at 416, 106 S.Ct. 1135. Unbeknownst to Burbine, his sister attempted to retain a lawyer in the public defender's office to represent him. *Id.* at 415–17, 106 S.Ct. 1135.[3] That attorney then contacted the police to inform them that Burbine was

represented by counsel. *Id.* at 417, 106 S.Ct. 1135. The attorney was assured by the police that Burbine would not be questioned that day. *Id.* Later that evening, Burbine was questioned by officers from another jurisdiction about the murder. *Id.* At the interrogation, Burbine stated that he did not want counsel, waived his *Miranda* rights, and gave an inculpatory statement. *Id.* at 417–18, 106 S.Ct. 1135; *see Miranda v. Arizona*, 384 U.S. 436, 472–74, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (discussing Fifth Amendment right to counsel during custodial interrogation). Although the attorney contacted by Burbine's sister had been misled, the lower court found that the State had not colluded or conspired to secrete Burbine from his attorney. *Id.* at 418, 106 S.Ct. 1135. On this record, the Supreme Court held that Burbine had validly waived his Fifth Amendment rights at the interrogation. *See id.* at 427, 106 S.Ct. 1135.[4]

---

*Holloway v. State*, 691 S.W.2d 608 (Tex.Crim. App.1984), *rev'd* 475 U.S. 1105, 106 S.Ct. 1508, 89 L.Ed.2d 908 (1986); *Dunn v. State*, 696 S.W.2d 561 (Tex.Crim.App.1985)). At the time *Lucas* was decided, both *Holloway* and *Dunn* had been overruled by the United States Supreme Court's opinions in *Michigan v. Jackson* and *Moran v. Burbine*. *See Holloway v. Texas*, 475 U.S. 1105, 106 S.Ct. 1508, 89 L.Ed.2d 908 (1986); *Goodwin v. State*, 799 S.W.2d 719, 729 (Tex.Crim.App.1990) ("the holding in *Dunn* has been implicitly overruled by the Supreme Court in *Moran v. Burbine*."). Moreover, *Lucas* was decided before the court of criminal appeals' opinion on remand in *Holloway* and has been implicitly overruled by that case. *See Holloway v. State*, 780 S.W.2d 787, 791 (Tex.Crim.App.1989).

**2.** In addition to *Terrell*, the majority cites several opinions, most of them civil and none of them arising under the Sixth Amendment, holding that the attorney-client relationship is a contractual one and that the parties must explicitly or by their conduct manifest an intention to create it. *See Hill v. Bartlette*, 181 S.W.3d 541, 547 (Tex.App.-Texarkana 2005,

no pet.) (wrongful death action; issue was alleged conflict of interest of insurer's attorney); *State v. DeAngelis*, 116 S.W.3d 396, 403 (Tex.App.-El Paso 2003, no pet.) (perjury prosecution; issue was attorney-client privilege); *Stephenson v. LeBoeuf*, 16 S.W.3d 829, 836 (Tex.App.-Houston [14th Dist.] 2000, pet. denied) (civil action against attorney for breach of fiduciary duty; issue was when contract with client terminated); *Vinson & Elkins v. Moran*, 946 S.W.2d 381, 405 (Tex. App.-Houston [14th Dist.] 2000, writ dism'd by agr.) (legal malpractice; issue was jury instruction's definition of "agreed"); *Parker v. Carnahan*, 772 S.W.2d 151, 156 (Tex.App.-Texarkana 1989, writ denied) (legal malpractice; issue was whether attorneys were entitled to summary judgment).

**3.** The majority opinion posits that different standards govern the establishment of an attorney-client relationship in retained and appointed counsel cases. Although a public defender, the attorney in *Burbine* had not been appointed.

**4.** I will discuss this later in this opinion.

The Court also rejected Burbine's Sixth Amendment challenge to the admission of his confession because the interrogation preceded the commencement of adversarial proceedings. *Id.* at 432, 106 S.Ct. 1135. The Court made it clear, however, that the police could not have initiated the interrogation and obtained a valid waiver of counsel under these circumstances had Burbine's Sixth Amendment rights attached. *See id.* at 428, 106 S.Ct. 1135. The Court wrote, "[W]e readily agree that once the right *has* attached, it follows that the police may not interfere with the efforts of a defendant's attorney to act as a ' "medium" between [the suspect] and the State' during the interrogation." *Id.*

The origin and nature of the relationship between Burbine and the attorney in that case is remarkably similar to the origin and nature of the relationship between Arabzadegan and the attorneys in this cause. Burbine, like Arabzadegan, was completely unaware of the activities of his sister and the attorney on his behalf. Burbine, like Arabzadegan, had never met the attorney. In fact, the state supreme court had held, as the majority does here, that no attorney-client relationship existed between Burbine and the attorney, stating among other things that the right to counsel cannot be invoked on behalf of a suspect by a family member or other third party. *State v. Burbine,* 451 A.2d 22, 29–30 (R.I.1982). Although the existence of an attorney-client relationship was conceded before the Supreme Court, the

Court took the trouble to observe that "the type of circumstances that would give rise to the right [to counsel under the Sixth Amendment] would certainly have a federal definition." *See Burbine,* 475 U.S. at 429 n. 3, 106 S.Ct. 1135. In other words, the Sixth Amendment right to counsel cannot be circumscribed by state contract law, as the Rhode Island Supreme Court had erroneously held in *Burbine* and as the majority erroneously suggests here.

Whether an accused has a relationship with an attorney that is entitled to protection under the Sixth Amendment must be determined in light of the interests the Sixth Amendment is designed to serve, and not merely under principles of contract law. It cannot be overstated that the right to the assistance of counsel safeguards the other rights deemed essential for the fair prosecution of a criminal proceeding. *Moulton,* 474 U.S. at 168–69, 106 S.Ct. 477. The Sixth Amendment guarantees an accused "the right to rely on counsel as a 'medium' between him and the State." *Id.* at 176, 106 S.Ct. 477. The State has an affirmative responsibility to respect and preserve the right to counsel, and prosecutors and police have an affirmative obligation not to act in a manner that circumvents or dilutes the protection afforded by the right to counsel. *Id.* at 171, 106 S.Ct. 477. The majority's insistence on the creation of an attorney-client relationship under civil contract law fails to honor these bedrock Sixth Amendment principles.[5]

---

**5.** The majority opinion cites four court of criminal appeals opinions said to recognize the contractual nature of the creation of the attorney-client relationship. Three of these opinions are not Sixth Amendment cases. *Mixon v. State,* 224 S.W.3d 206, 208–09 (Tex. Crim.App. 2007) (holding that attorney-client privilege applied to information acquired by lawyer during discussions looking toward employment); *Strong v. State,* 773 S.W.2d 543,

552 (Tex.Crim.App.1989) (holding that letter from defendant to co-defendant's lawyer was not privileged); *Green v. State,* 667 S.W.2d 528, 532–33 (Tex.Crim.App.1984) (holding that defendant's decision not to employ counsel due to inability to afford fee did not constitute waiver of Fifth Amendment right to counsel under *Miranda* ). The fourth opinion is a Sixth Amendment case that supports my argument that Arabzadegan's right to counsel

It is a common occurrence for a third party—usually a parent, spouse, or other family member—to obtain an attorney for a person who finds himself incarcerated and accused of a crime. Whether or not such an arrangement creates a formal attorney-client relationship for the purpose of deciding a question of attorney-client privilege, legal malpractice, or conflict of interest, it is sufficient to create a relationship between the attorney and the accused warranting recognition under the Sixth Amendment. The majority expresses the concern that an accused cannot be bound by an attorney-client relationship established on his behalf by a third party. But the relevant question is not whether the family's retention of an attorney is binding on the accused, but whether it is binding on the police. Contract principles do not bind the police; it is the Sixth Amendment safeguards aimed at preserving the sanctity of the attorney-client relationship that constrain the police from interfering with the efforts of an attorney to communicate with his client. *See Patterson v. Illinois,* 487 U.S. 285, 290 n. 3, 297 n. 9, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988); *Burbine,* 475 U.S. at 428, 106 S.Ct. 1135.

In light of the strong policy that the State not circumvent or dilute the Sixth Amendment right to rely on counsel, no one can reasonably suggest that the police should be permitted to decide the contractual merits of a lawyer's claim that he represents an accused in custody before allowing the lawyer to speak to his client. Not only is this idea inconsistent with Sixth Amendment values, police officers

and sheriff's deputies are not qualified to make such an evaluation and should not be expected to do so. Furthermore, to require the accused to prove the existence of a contractual attorney-client relationship, as the majority would do, impermissibly shifts to the accused the burden the constitution places on the State to prove a valid waiver of counsel. *See Michigan v. Jackson,* 475 U.S. 625, 633, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986). The State's duty to act in a manner that does not circumvent or dilute the right to counsel requires that prosecutors and police respect an attorney's claim of representation unless they have a reasonable basis to question the claim.[6]

If the State's agents had any reason to believe that Arabzadegan was not represented by counsel, it is not apparent from the record. At the hearing on Arabzadegan's motion to suppress, Detective Halvorsen testified that Joe Turner called him before Arabzadegan was arrested to tell him that he had been retained. Halvorsen added, "I don't know if [Arabzadegan] retained [Turner] or if his family retained him." Josh Saegert, the attorney associated with Turner who went to the sheriff's office to speak to Arabzadegan, testified that he also did not know whether Turner had spoken directly with Arabzadegan. Neither Arabzadegan nor Turner testified at the suppression hearing. Thus, the record shows that (1) an attorney contacted the lead investigator at the sheriff's office to inform him that Arabzadegan was represented by counsel,[7] and (2) within min-

---

was violated. *Upton v. State,* 853 S.W.2d 548, 556–57 (Tex.Crim.App.1993).

**6.** The majority opinion expresses the fear that in the absence of strict adherence to contract law principles, third parties might "manipulate the process without the knowledge or involvement of either the accused or the police." Of course, I do not contend that the

police can be bound by a relationship between a lawyer and an accused, whatever its purported basis, of which they are not aware.

**7.** The State contends that Turner did not unambiguously state in this telephone call that he represented Arabzadegan, but the court of criminal appeals has held that a similar com-

utes of Arabzadegan's arrest, an associate of the first attorney arrived at the sheriff's office demanding to meet with Arabzadegan. It is irrelevant whether the officers who interrogated Arabzadegan were personally aware of these communications because we impute knowledge from one state actor to another. *Id.* at 634, 106 S.Ct. 1404; *Holloway v. State*, 780 S.W.2d 787, 796 n. 11 (Tex.Crim.App.1989).[8] The State did not elicit any evidence that Arabzadegan had knowingly rejected the assistance of Turner and Saegert, a subject I discuss below, or that the police had any other reasonable basis to doubt the attorneys' claims of representation. *See Upton*, 853 S.W.2d at 557. The evidence before us establishes as a matter of law that Turner and his associate Saegert were Arabzadegan's attorneys for the purposes of the Sixth Amendment.

## III.

The concurring opinion argues that Arabzadegan's Sixth Amendment right to counsel was not violated at the interrogation because he did not personally invoke his right to counsel. In this view, the interrogating officers were entitled to disregard the attorneys' claims that they represented Arabzadegan so long as Arabzadegan did not say that he wanted a lawyer. This argument is contrary to holdings by both the Supreme Court and the Texas Court of Criminal Appeals.

The State had the burden to show that Arabzadegan validly waived the Sixth Amendment right to counsel. *See Jackson*, 475 U.S. at 633, 106 S.Ct. 1404; *Up-*

*ton*, 853 S.W.2d at 553; *Robinson v. State*, 851 S.W.2d 216, 224 (Tex.Crim.App.1991). An accused who is not represented by counsel and who has not invoked his right to counsel may submit to interrogation, validly waiving both his Fifth and Sixth Amendment rights, if he is first given the *Miranda* warnings. *See Patterson*, 487 U.S. at 292–93, 108 S.Ct. 2389; *Robinson*, 851 S.W.2d at 224 (citing *Patterson*). This does not mean, however, that all Sixth Amendment challenges to the conduct of post-accusation interrogation will fail whenever the challenged practice would pass constitutional muster under *Miranda*. *Patterson*, 487 U.S. at 296 n. 9, 108 S.Ct. 2389.

> [B]ecause the Sixth Amendment's protection of the attorney-client relationship—"the right to rely on counsel as a 'medium' between [the accused] and the State"—extends beyond *Miranda's* protection of the Fifth Amendment right to counsel [citing *Moulton*, 474 U.S. at 176, 106 S.Ct. 477], there will be cases where a waiver which would be valid under *Miranda* will not suffice for Sixth Amendment purposes.

*Id.* After a formal accusation has been made, and a "suspect" becomes an "accused" within the meaning of the Sixth Amendment, "the constitutional right to the assistance of counsel is of such importance that the police may no longer employ techniques for eliciting information from an uncounseled defendant that might have been entirely proper at an earlier stage of their investigation." *Jackson*, 475 U.S. at 632, 106 S.Ct. 1404.

munication by an attorney was sufficient to conclusively establish representation. *See Upton*, 853 S.W.2d at 556–57.

8. The concurring opinion suggests that it is unfair or impractical to "instantaneously" impute to the officers interviewing Arabzadegan the knowledge that Saegert was outside want-

ing to talk to him. This argument, and a similar argument in the majority opinion, overlooks Halvorsen's testimony, which shows that the lead investigator knew that Turner had been retained days before Arabzadegan was arrested and questioned.

Once an accused has a lawyer, a distinct set of constitutional safeguards aimed at preserving the sanctity of the attorney-client relationship takes effect, and the police may not interfere with the efforts of an attorney to communicate with his client. *Patterson*, 487 U.S. at 290 n. 3, 108 S.Ct. 2389. In *Patterson*, the Supreme Court explained that the protections of the Sixth Amendment are not coextensive with those provided by the Fifth Amendment. The Court wrote, "[W]e have permitted a *Miranda* waiver to stand where a suspect was not told that his lawyer was trying to reach him during questioning; in the Sixth Amendment context, this waiver would not be valid." 487 U.S. at 297 n. 9, 108 S.Ct. 2389. The Court was referring to its opinion in *Burbine*. *Id.*

The Supreme Court held that Burbine had validly waived his Fifth Amendment rights in accordance with *Miranda* even though, without his knowledge, his sister had obtained an attorney for him and the attorney had contacted the police to inform them that Burbine was represented by counsel. *Burbine*, 475 U.S. at 427, 106 S.Ct. 1135. The Court explained that the procedure required by *Miranda* represented a careful balance between the State's legitimate interest in eliciting admissions and an individuals's right against self-incrimination. *Id.* The Court held that a rule requiring police to inform the suspect of an attorney's efforts to contact him "would upset this carefully drawn approach in a manner that is both unnecessary for the protection of the Fifth Amendment privilege and injurious to legitimate law enforcement." *Id.* The Court made it clear, however, that once the Sixth Amendment attaches, this balance shifts and the police may not interrogate an accused without revealing the attorney's presence: "[W]e readily agree that once the right *has* attached, it follows that the police may not interfere with the efforts of

a defendant's attorney to act as a ' "medium" between [the accused] and the State' during the interrogation." *Id.* at 428, 106 S.Ct. 1135.

Drawing on the Supreme Court opinions discussed above, the court of criminal appeals has held that when the police know that an accused is represented by counsel, the Sixth Amendment precludes dissolution of that relationship in the absence of counsel. *Holloway*, 780 S.W.2d at 795. In such a case, the police may initiate interrogation only through notice to defense counsel, and an accused's unilateral waiver of his Sixth Amendment right to counsel is invalid. *Upton*, 853 S.W.2d at 553. In *Upton*, the court further held that the application of this rule does not depend on an accused's invocation of his right to counsel, because the rule is designed to preserve the integrity of the attorney-client relationship once it has been established. *Id.*

By asserting that Arabzadegan forfeited his Sixth Amendment right to counsel by failing to personally invoke it, the concurring opinion effectively equates the Sixth Amendment right with the Fifth Amendment right. But the Fifth Amendment right to counsel recognized in *Miranda* is designed to serve the narrow purpose of assuring that any confession resulting from custodial interrogation is voluntary. *See Burbine*, 475 U.S. at 420, 106 S.Ct. 1135. The Sixth Amendment right to counsel, on the other hand, protects the attorney-client relationship. *See Patterson*, 487 U.S. at 290 n. 3, 108 S.Ct. 2389 ("Once an accused has a lawyer, a distinct set of constitutional safeguards aimed at preserving the sanctity of the attorney-client relationship takes effect."); *Burbine*, 475 U.S. at 428, 106 S.Ct. 1135 ("[O]nce the [Sixth Amendment] right *has* attached, it follows that the police may not interfere with the efforts of a defendant's attorney

to act as a ' "medium" between [the suspect] and the State.' "); *Holloway,* 780 S.W.2d at 795 ("[W]e hold that where a relationship between the accused and his attorney has become applicable, the Sixth Amendment precludes dissolution of that relationship in the absence of counsel."); *Upton,* 853 S.W.2d at 553 ("Application of the *Holloway* rule does not depend on an accused's invocation of his Fifth or Sixth Amendment rights to counsel, because this rule is designed to preserve the integrity of the attorney-client relationship once it has been established."). Arabzadegan does not contend that his confession was involuntary or that his Fifth Amendment rights were otherwise violated. Instead, Arabzadegan argues that the officers who interrogated him did not respect his right *to rely on counsel as a medium between him and the State.* The concurring opinion errs by holding that in the context of a custodial interrogation of a person formally accused of a crime, the Sixth Amendment places no obligations on the police beyond those imposed by *Miranda* under the Fifth Amendment.

Arabzadegan's failure to expressly request counsel during the interrogation does not excuse the officers' failure to notify him that retained counsel was present to assist him. Under the circumstances shown here, Arabzadegan's silence did not effectively waive or otherwise forfeit his Sixth Amendment right to counsel.

### IV.

The majority insists that an accused is absolutely entitled to reject the assistance of an attorney recruited by third parties. I insist that an accused must be given a reasonable opportunity to make that decision. Arabzadegan did not knowingly reject the assistance of the attorneys employed by his parents because the police kept their existence a secret from him.

The majority stresses the importance of mutuality in the attorney-client relationship, but it condones police conduct designed to prevent Arabzadegan from knowingly and voluntarily choosing whether to accept the assistance of Turner and Saegert or go it alone.

I do not contend that an accused cannot waive his Sixth Amendment right to counsel if a lawyer has been retained for him, but it would be foolish to suggest that knowledge that a retained attorney is standing outside the door of the interrogation room would not influence the accused's decision. The police understand this; it is why they want to proceed with an interrogation without imparting this knowledge to the accused. But a waiver of counsel made in the absence of this crucial information cannot be truly voluntary. Once the police know that an attorney has been retained for the accused and is present, the Sixth Amendment requires them to reveal this information to the accused before proceeding with an interrogation.

### V.

The record shows that the police were on notice that an attorney was working on Arabzadegan's case before Arabzadegan was arrested. In fact, an attorney was present at the sheriff's office when Arabzadegan waived his *Miranda* rights, but this attorney was unable to gain access to his client. There is no evidence that would justify the officers' ignoring the attorneys' claims of representation. *See Burbine,* 475 U.S. at 428, 106 S.Ct. 1135. Because Arabzadegan was represented by counsel, the police could not initiate interrogation without notice to counsel, and Arabzadegan's unilateral waiver of his right to counsel was invalid. *See Upton,* 853 S.W.2d at 553. At the very least, the officers violated their affirmative obligation not to act in a manner that circumvents or dilutes the

right to counsel by ignoring Turner's and Saegert's claims to represent Arabzadegan and by obtaining Arabzadegan's waiver of the right to counsel without informing him that an attorney claiming to represent him was present and seeking to talk to him. *See Patterson,* 487 U.S. at 297 n. 9, 108 S.Ct. 2389. On this record, I would hold that Arabzadegan's confession was obtained in violation of his Sixth Amendment right to counsel and that the district court erred by overruling his motion to suppress. *See* Tex.Code Crim. Proc. Ann. art. 38.23 (West 2005).

The rules of appellate procedure require us to reverse a conviction for constitutional error unless we determine beyond a reasonable doubt that the error did not contribute to the conviction. *See* Tex.R.App. P. 44.2 (incorporating holding in *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). We must be especially cautious when applying the *Chapman* standard in cases where a defendant's own confession was erroneously admitted:

> A confession is like no other evidence. Indeed "the defendant's own confession is probably the most probative and damning evidence that can be admitted against him ... [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have a profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so."

*Arizona v. Fulminante,* 499 U.S. 279, 296, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (quoting *Bruton v. United States,* 391 U.S. 123, 139–40, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (White, J. dissenting)). I cannot conclude beyond a reasonable doubt that the district court's erroneous decision to

admit Arabzadegan's confession did not contribute to his decision to plead guilty.

I would reverse the judgment of conviction and remand the cause to the district court for a new trial.